1   Paul Y. Feng (SBN 146889)
    pfeng@onellp.com
2   Stephen M. Lobbin (SBN 181195)
    slobbin@onellp.com
3   **ONE LLP**
    4000 MacArthur Blvd., East Tower, Suite 500
4   Newport Beach, California  92660
    Tel:   949.444.5677
5   Fax:   949.258.5081

6   John Lord (SBN 216111)
    jlord@onellp.com
7   **ONE LLP**
    9301 Wilshire Boulevard, PH
8   Beverly Hills, California  90210
    Tel:   310.866.5157
9   Fax:   310.943.2085

10  Attorneys for Plaintiff/Counterdefendant
    **Cordelia Lighting, Inc.**

11

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                   **EASTERN DIVISION**

16

17

18

19  **Cordelia Lighting, Inc.**, a California      Case No. 5:14-CV-00881-JGB-SP
    corporation,
20                                                 **DECLARATION OF STEPHEN M.**
                    Plaintiff,                     **LOBBIN IN SUPPORT OF**
21                                                 **CORDELIA'S MOTION FOR**
            v.                                     **PRELIMINARY INJUNCTION**
22
    **Zhejiang Yankon Group Co., Ltd.**            Date:  April 27, 2015
23  **d/b/a Energetic Lighting**, a China          Time:  9:00 a.m.
    company, and **Yankon Industries Inc.**,       Ctrm:  1
24  a California corporation,
                                                   Honorable Jesus G. Bernal
25                  Defendants.

26  _____

    AND RELATED COUNTERCLAIMS
27

28

Lobbin Decl. ISO Motion for Prelim. Injunction
                                             Case No. 5:14-cv-00881-JGB-SP

I, Stephen M. Lobbin, declare and state as follows:

1.     I am an attorney with One LLP, counsel for Plaintiff Cordelia Lighting, Inc. ("Cordelia") in the above-captioned action.  I have personal knowledge of the facts stated herein, and if called to testify as a witness, I could and would testify competently thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the patent-in-suit, U.S. Patent No. 8,454,204 ("the '204 patent").

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Notice of Allowance from the U.S. Patent Office related to the '204 patent, dated March 5, 2013.

4.     Attached hereto as Exhibit 3 is a true and correct copy of Defendant Yankon Industries, Inc.'s Response to Plaintiff Cordelia Lighting, Inc.'s Interrogatories, served November 14, 2014.

5.     Attached hereto as Exhibit 4 is a true and correct copy of two document pages produced in this action by Plaintiff Cordelia, labeled CL000651-652.

6.     Attached hereto as Exhibit 10 is a true and correct copy of an internet web page from <i.cantonfaircn.org>.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and if called to testify, I could and would competently do so.

Executed on this 30th day of March, 2015, at Irvine, California.


/s/ Stephen M. Lobbin
_____

# EXHIBIT 1

US008454204B1

(12) **United States Patent**
Chang et al.

(10) **Patent No.:** **US 8,454,204 B1**
(45) **Date of Patent:** **Jun. 4, 2013**

(54) **RECESSED LED LIGHTING FIXTURE**

(75) Inventors: **Seth Chang**, Rowland Heights, CA
(US); **Huan Cao Nguyen**, Anaheim, CA
(US); **James Madden**, Philadelphia, PA
(US)

(73) Assignee: **Cordelia Lighting, Inc.**, Rancho
Dominguez, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 6 days.

(21) Appl. No.: **13/338,191**

(22) Filed: **Dec. 27, 2011**

(51) **Int. Cl.**
    *F21V 29/00*          (2006.01)
(52) **U.S. Cl.**
    USPC ............................. **362/294**; 362/257; 362/92
(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,145,179 | B2 | 12/2006 | Petroski |
| 7,399,104 | B2 * | 7/2008 | Rappaport .................... 362/365 |

| | | | |
|---|---|---|---|
| 7,748,869 | B2 * | 7/2010 | Sevack et al. ................. 362/277 |
| 8,128,264 | B2 * | 3/2012 | Genenbacher ................ 362/398 |
| 2005/0265016 | A1 | 12/2005 | Rappaport |
| 2007/0183154 | A1 | 8/2007 | Robson |
| 2007/0211475 | A1 | 9/2007 | Sevack et al. |
| 2010/0290240 | A1 | 11/2010 | Genenbacher |
| 2011/0267827 | A1 * | 11/2011 | Wein ............................. 362/368 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2738802 A1 | 7/2010 |

* cited by examiner

*Primary Examiner* — Natalie Walford
(74) *Attorney, Agent, or Firm* — Paul Y. Feng; The Eclipse
Group LLP

(57)          **ABSTRACT**

A recessed lighting fixture providing illumination from a
light source including a plurality of light emitting diodes
(LEDs) wherein the fixture is placed within the ceiling space
above a ceiling panel or wall. The fixture has a low aspect
ratio heat sink. An interchangeable trim ring has an integrated
light reflector and attaches to the bottom of the heat sink via
rare earth or super magnets. A flange of the heat sink and a flat
annular surface of the trim ring engage each other, providing
a large contact surface to enable conductive heat transfer. The
flange and flat annular surface are located below the ceiling
panel, which is at room temperature to help cool the recessed
LED lighting fixture through radiation and air convection.

**20 Claims, 6 Drawing Sheets**



Case 5:14-cv-00881-JGB-SP  Document 40  Filed 03/30/15  Page 5 of 56  Page ID #:334





FIG.3

U.S. Patent    Jun. 4, 2013    Sheet 3 of 6    US 8,454,204 B1



FIG.4



**FIG.6**

**FIG.5**



**FIG.7**



**FIG.9**



**FIG.8**

US 8,454,204 B1

**1**

## RECESSED LED LIGHTING FIXTURE

### BACKGROUND

The present invention relates generally to lighting fixtures and, more particularly, to a LED recessed lighting fixture that provides improved heat dissipation.

Recessed lighting fixtures are well known in the art. Ideally, such fixtures are designed to be visually unobtrusive in that very little of the lighting fixture is visible from below the ceiling. However, some trim portions are visible as well as the light sources. An opening is cut into the ceiling into which most of the lighting fixture is mounted so that very little extends below the plane of the ceiling. A trim piece or trim ring, which may take the form of a bezel, is generally located at the opening to enhance the appearance of the light fixture and conceal the hole cut into the ceiling. Typically, the trim piece is slightly below the planar surface of the ceiling.

Such bezels or other types of trim pieces also include insulation located between the trim piece and the ceiling. In many cases, recessed lighting fixtures are installed in holes in ceilings where the temperature is much different from that of the room into which the light fixture provides illumination. The insulation tends to oppose changes of the room temperature due to the hole cut in the ceiling for the lighting fixture.

Although described in a ceiling embodiment, such lighting fixtures are also used in walls in both dwelling structures and in automobiles, in numerous commercial building applications, and in many other applications like an RV, custom homes, etc. Such lighting fixtures are generally referred to herein as "recessed."

Different light sources are used for recessed lighting fixtures. Some light sources generate substantial amounts of heat, so much so that the rating of the light fixture must be displayed and warnings given that light sources above a certain wattage could pose an overheating problem and are not to be used. However, in some cases, the lighting fixture must be located a substantial distance away from the object to be illuminated and higher wattage light sources are necessary to develop the amount of illumination needed. Such wattage limits imposed by the lighting fixtures can undesirably limit the amount of light furnished by the fixture. For example, lighting fixtures located in higher ceilings, which are more common today, or lighting fixtures that are meant to shine at an angle other than perpendicular to illuminate an object, may not provide enough light for the object if lower wattage light sources must be used. Consequently, lighting fixtures able to accommodate higher heat levels are desired in such situations. Such lighting fixtures must be able to dissipate increased levels of heat to avoid a hazard.

Typically used in conjunction with a recessed lighting fixture is a "can" or housing, which is fixedly mounted into the ceiling through the ceiling panel opening. Such housings are generally metallic and thermally conductive. They also are generally connected to electrical earth ground. A "trim unit," which may include one or more light sources, a trim ring, and other devices to provide the aesthetic design and lighting functions is mounted within the housing. Various trim units may be available for mounting within any one housing. The trim unit typically receives the light bulb or other light source or sources and provides the necessary electrical power to them for illumination.

### SUMMARY OF THE INVENTION

The present invention in a preferred embodiment is directed to a recessed lighting fixture located in an opening in

**2**

a ceiling panel, the lighting fixture comprising a cylindrical shaped heat sink having a low aspect ratio such that the height is less than the diameter, the heat sink having a top and a bottom, an open center at the top leading to a cavity facing the bottom, the cavity having a sloped wall, the heat sink having a flange at the bottom extending radially outward and defining a flat surface at the bottom. The heat sink includes heat fins disposed at the top and outer circumference. The light source is preferably an array of Light Emitting Diodes (LEDs). An LED driver having an electrical cable extending therefrom is disposed generally on top of the heat fins leaving an air gap between the LED driver and the heat fin in the spaces between the heat fins. An LED array emitting visible light is electrically connected to the LED driver and disposed at the open center, facing downward to emit light out of the recessed fixture.

The lighting fixture includes an interchangeable trim ring having an open center with a sloped wall defining a reflector that is covered in a light reflective material, wherein the reflector overlies the sloped wall of the cavity. The trim ring further includes a flat annular surface engaging the flat surface of the heat sink flange for thermal conduction therebetween to reduce heat generated by the LED driver and LED array.

The trim ring at the flat annular surface and the heat sink flange are located below the ceiling panel or planar surface, such that the structure is exposed to cooler ambient room air, versus above the ceiling panel or planar surface, which area is typically a closed space where ambient heat can build up. The heat sink, fins, flange, and trim ring should be conducive to heat transfer to help dissipate heat of the lighting fixture via conduction, convection, and radiation

One or more rare earth magnets are used to attach the flat annular surface of the trim ring to the flat surface of the heat sink flange. As such, portions or all of the trim ring and heat sink flange should be made from magnetically attractive material, or be ferromagnetic.

In various embodiments, the recessed lighting fixture uses an electrical cable that includes a detachable Edison screw plug. Thus, the recessed lighting fixture may be used to retrofit an existing incandescent light fixture that has an Edison screw socket in place.

Further, the open center of the heat sink at the bottom may include a lens enclosing the LED array to help diffuse or diffract the light for a softer lighting effect. In the preferred embodiment, the recessed lighting fixture uses rare earth magnet such as a neodymium magnet. Also, the heat sink is preferably made from cast aluminum to allow better heat transfer through conduction, for example.

These and other aspects, features, and advantages of the present invention will become apparent from the following detailed description of the preferred embodiments which, taken in conjunction with the accompanying drawings, illustrate by way of example the principles of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a top perspective view of a preferred embodiment of the present invention recessed LED lighting fixture;

FIG. **2** is a top perspective view of the lighting fixture from FIG. **1** with the interchangeable trim ring detached and gasket loose around the fixture;

FIG. **3** is a bottom-looking-up perspective view of the preferred embodiment lighting fixture from FIG. **1** in use, wherein the fixture is installed inside a can and positioned in an opening of a ceiling panel;

**3**

FIG. **4** is an enlarged, detail view of the preferred embodiment heat sink and surrounding structures;

FIG. **5** is a bottom perspective view of the lighting fixture from FIG. **1** with the interchangeable trim ring detached;

FIG. **6** is an isolated view of the bottom portion of an alternative lighting fixture with a twist lock interchangeable trim ring;

FIG. **7** is a cross-sectional view of the lighting fixture taken at about line A-A of FIG. **1**;

FIG. **8** is a bottom perspective view of the lighting fixture with the lens cover removed and the LED array disassembled; and

FIG. **9** is a top-looking-down perspective view of the lighting fixture of FIG. **1** wherein the LED driver is disassembled from the heat sink, and the Edison plug has been detached from the electrical connection.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention in various preferred embodiments is directed to a recessed lighting fixture that uses a LED as the light source to conserve energy and for long life of the light source as compared to, for example, incandescent bulbs. The present invention light fixture can be installed in a residential new construction or used to retrofit a pre-existing home or building that has recessed lighting fixtures.

FIG. **1** is a perspective view of a preferred embodiment recessed lighting fixture **10**. The lighting fixture is has a LED light source that is powered by an LED driver **12**, which is the power supply and voltage control for the LED light source. In normal operation, the LED light source and the LED driver **12** generate a lot of heat, so a heat sink **16** is used to conduct and dissipate heat from both. An electrical connection or power cables **18** supplies electrical power to the LED driver **12**. The power cables **18** terminate in an Edison type screw plug **20**. This Edison screw plug **20** allows the lighting fixture **10** to replace an incandescent bulb inside a preexisting lighting fixture. In such a retrofit, the preexisting incandescent bulb is removed and the Edison screw plug **20** is screwed into the Edison bulb socket. The power cables **18** also include a snap lock connector **22** for the end user or electrician to disconnect the Edison screw plug **20** from the lighting fixture **10**. This is for new construction where no Edison screw-type socket is needed, so the Edison plug **20** can be detached. Once detached, the snap lock connector **22** or its power cables **18** can be directly connected to the standard household wiring.

FIGS. **1** and **2** show that the lighting fixture **10** includes an optional annular-shaped gasket **24** to seal the environment below the ceiling panel from above the ceiling panel. An end user interchangeable trim ring **28** is shown attached to the bottom of the lighting fixture **10** in FIG. **1** and detached in FIG. **2**. The trim ring **28** faces downward where the trim ring **28** is visible to the end use, presumably the homeowner, so the interchangeability feature enables the homeowner to select the style to match the color and decor of the room. The interchangeable trim ring **28** can be made in different finishes, designs, shapes, sizes, etc. Its surface finish can be painted, anodized, and/or electroplated to offer a variety of finishes. Accordingly, the homeowner can select from the store the trim rings **28** that best match his or her home's decor and color scheme. To enable this interchangeability, the trim rings **28** are preferably attached to the lighting fixture **10** via magnets (described in detail below), so attaching or detaching the trim ring **28** is easily accomplished by the homeowner without need for any tools or manipulation of complicated hardware.

**4**

FIG. **3** depicts the present invention lighting fixture **10** from underneath-looking-up, as used in a retrofit application. The lighting fixture **10** is installed inside a housing or "can" **26** already in place in the home that is being retrofitted. The can **26** is a standard piece of hardware in residential home and commercial building construction that contains the recessed lighting fixture, which historically uses an incandescent bulb. The can is typically cylindrical in shape with a closed end and an open end, wherein the lighting fixture is mounted to the interior while electrical cables and fixture hardware are attached to the exterior.

FIG. **3** shows the fixture **10** connected to the Edison socket **30** already present inside the can **26** to power the new fixture **10**. Spring clips **32** extending outward from the heat sink **16** snap into complementary receiving slots or ledges inside the can **26** to hold the fixture **10** to the can **26**.

The short, cylindrical heat sink **16** preferably includes a radial, annular flange **34** around the circumference at its bottom. The heat sink flange **34** has a flat, top annular surface **36** (FIG. **2**) and a flat, bottom annular surface **38** (FIG. **3**). The gasket **24** rests on the top annular surface **36**. The bottom annular surface **38** fits flush against a flat annular top surface of the trim ring **28**. Magnets **40** are embedded into the bottom annular surface **38**.

FIG. **3** further shows the LED lighting fixture **10** installed to a permanent ceiling drywall, ceiling tile or panel, or like planar surface **42**, found in typical residential homes or commercial construction. The ceiling panel or planar surface **42** separates the living space of the room below it from the attic or air space above it where electrical cables, insulation, and HVAC ducting are contained.

In the preferred embodiment, the heat sink flange **34** is strategically located beneath the ceiling panel or planar surface **42**. This is best seen in FIG. **3**. FIG. **4** is a side elevational view of the structures in FIG. **3**, partially in cross-section. FIG. **4** shows the can **26** and the light fixture **10** generally situated in the traditional arrangement above the ceiling panel or planar surface **42**, while the heat sink flange **34** protrudes below the planar surface **42**. Feet **48** on the outside of the can **26** help stabilize it on top of the ceiling panel or planar surface **42**.

In FIG. **4**, the heat sink flange **34** is situated completely below the level of the ceiling panel or planar surface **42**. The gasket **24** rests atop the flange **34** on its top annular surface **36** (FIG. **2**) and abuts the underside of the ceiling panel or planar surface **42** (FIG. **4**). The gasket **24** creates a generally air-tight seal between the top annular surface **36** of the flange **34** and the ceiling panel **42**. The interchangeable trim ring **28** engages the bottom annular surface **38** of the heat sink flange **34**. A plurality of magnets **40** attaches the trim ring **28** to the flange **34**.

FIG. **4** thus shows the division by the ceiling panel or planar surface **42** of the ceiling space into the living area **44** below and the air space or attic **46** above. Ambient temperatures generated inside the can **26** is generally 70 degrees C. or higher. Depending on season, climate, geographic region, thermostat setting in the room, ambient temperature in the air space or attic **46** above the ceiling panel **42** can reach over 100 degrees C. Typical room temperature in the living area **44** below the ceiling panel **42** is about 25 degrees C. or lower. Therefore, by locating the heat sink flange **34**, which is a large body of material of the heat sink **16**, below the ceiling panel or planar surface **42**, the heat generated from the LED light source and LED driver can be dissipated by conduction through the heat sink **16**, then via radiation and air convection at the flange **34**. Because the ambient temperature in the living area **44** beneath the ceiling panel or planar surface **42** is on

US 8,454,204 B1

5

average about 45 degrees C. below that of the attic or air space **46** above the ceiling panel **42**, heat transfer and heat dissipation are greatly facilitated by this arrangement.

The trim ring **28** is in direct contact with the heat sink flange **34** over a large surface area that is the bottom annular surface **38**. Through thermal conduction at these contact surfaces, the trim ring **28** also acts as a heat sink and further helps dissipates LED and LED driver generated heat through radiation and air convection to the ambient living area environment **44**, which is at 25 degrees C. or lower. Because of its relatively large surface area being exposed to the cooler environment beneath the ceiling panel **42**, the trim ring **28** functions effectively to dissipate heat. Through empirical observations, the above-described cooling mechanism lowers LED case temperature. As a result, the LED light source when properly cooled emits a higher luminance for a given wattage and enjoys a prolonged duty life.

FIG. **7** is a cross-sectional view of the lighting fixture **10** taken along line A-A of FIG. **1**. FIGS. **7** and **8** show the preferred embodiment lighting fixture **10** having the LED driver **12** mounted atop the heat sink **16**. The heat sink **16** has a cylindrical shape with a hollow center or cavity **68** and an open bottom, and the inner wall of this cavity **68** is sloped. The LED light source, here an LED array **14**, is mounted on the bottom side of the heat sink **16** within the cavity **68**. The heat sink **16** preferably has a very low aspect ratio such that its diameter is greater than its height, making it very low profile. This low profile LED lighting fixture **10** allows it to be installed in a variety of preexisting can sizes, including cans that have a shallow depth.

FIG. **9** shows the heat sink **16** having a plurality of heat dissipation fins **50** extending radially along the outer circumferential wall of the heat sink **16** and on top of the heat sink **16**. The LED driver **12** preferably mounts on top of the heat sink fins **50**, thereby leaving air gaps **52** between the fins **50** and between the LED driver **12** and the top of the heat sink **16**. The air gaps **52** are in fluid communication with each other, and can be seen in FIGS. **4**, **7**, and **9**. Via empirical observations, the air gaps **52** provide air movement therethrough and expose more surface area of the LED driver **12** to the ambient air, which enhances air convection cooling.

As best seen in the cross-sectional view of FIG. **7**, the heat sink **16**, fins **50**, and flange **34** are all preferably formed from one unitary piece of material for the most efficient thermal conduction of heat from the LED array **14** and the LED driver **12** to the fins **50** and flange **34**. Cast aluminum is preferably used for the heat sink, fins, and flange. Steel and iron alloys may be used as well.

FIGS. **7** and **8** show the LED array **14** and LED driver **12**. As is recognized in the art, they generate heat. To help dissipate this heat, they are directly attached to the heat sink **16**. The LED array **14** faces and emits visible light through the cavity **68** in the heat sink **16** downward into the living space **44** below. An optional lens cover **54** softens and/or diffuses the light emitted by the LED array **14** and fits inside the cavity **68**.

The interchangeable trim ring **28** has a relatively large mass and surface area, as seen in FIGS. **2**, **3**, and **7**, to enhance heat dissipation. This large mass and large surface area of the trim ring **28**, in the preferred embodiment, are composed of an outer ring component **56** and an inner frusto-conical cone component **58**.

As best seen in FIG. **7**, the top surface of the outer ring component **56** engages the bottom annular surface **38** of the heat sink flange **34**, which is conducive to heat transfer. The inner frusto-conical cone component **58** is a sloped wall that leads up to the lens cover **54**. The cone component **58** abuts

6

and overlies a portion of the interior sloped wall of the cavity **68** inside the heat sink **16**. This contact area further enhances conduction of heat from the heat sink **16** to the trim ring **28**, where the cone component **58** then dissipates the heat.

In FIG. **7**, the interior of the cone component/sloped wall **58** directly surrounding the lens **54** may be layered or coated with light reflective material, so that the sloped wall **58** acts as a reflector for the lighting fixture **10**. Thus, the preferred embodiment trim ring **28** functions as (a) an aesthetic finish for the lighting fixture **10**, (b) a light reflector, and (c) a heat sink. The trim ring **28**, to be attracted by the magnet **40**, preferably includes a ferromagnetic material. It is preferably made from stamped steel, allowing it to be attracted by the magnets and also functioning well as a heat conductor. Its surfaces can be treated, coated, painted, etc. for the customer desired aesthetics and to function as a light reflector. The trim ring in alternative embodiments may be a composite with a steel or iron skeleton and a plastic molded shell or facade. Or the entire trim ring may be plastic, fiberglass, etc., and patches of ferromagnetic material are embedded into the trim ring.

The permanent magnets **40** used to join trim ring **28** and heat sink flange **34** are preferably a type of samarium-cobalt magnet, a neodymium magnet, a ceramic/ferrite magnet, or an alnico magnet. The preferred embodiment uses the neodymium magnet or samarium-cobalt magnet, generally known as "rare earth" magnets. Most preferably, the neodymium magnet (an NdFeB alloy), also known as a "super magnet," is chosen because of its high remanence (magnetic field strength) and high coercivity (resistance to being demagnetized). These characteristics are preferred because the magnets **40** are used in a harsh environment by being attached to a part of a heat sink, specifically, the heat sink flange **34**. From the LED lighting fixture being turned on and off in normal use, there is cyclic heating and cooling of the heat sink flange **34** and correspondingly the magnet **40**. Hence, through empirical observation, the neodymium magnet is preferred for use with the present invention LED lighting fixture.

Further, the strong magnetic field of the neodymium magnet provides the end user with a positive engagement and perceived mechanical lock when the trim ring is installed. The attachment of the trim ring will not loosen or self detach over time.

FIG. **5** shows the preferred embodiment where the trim ring **28** is attached to the LED lighting fixture **10** by use of magnets **40**. FIG. **6** is an alternative embodiment where the trim ring **60** is attached mechanically to the LED lighting fixture **10**. This embodiment employs a twist lock. Here, the interior of the heat sink **16** includes a ledge **62** and the trim ring **60** has a lip **64** with a cutout **66** that receives the ledge **62**. The trim ring **60** is pushed against the fixture so that the ledge passes through the cutout **66**, then twisted so the ledge **62** is no longer aligned with the cutout **66**. The ledge **62** is thus captured by the lip **64** so the trim ring **60** cannot detach from the fixture. The lip **64** may optionally have a slight incline as in a screw thread to help advance the trim ring **60** into the lighting fixture **10** for a tighter fit.

Although the present invention has been described in terms of certain preferred embodiments, other embodiments that are apparent to those of ordinary skill in the art are also within the scope of the invention. Components and features of one embodiment may be combined with other embodiments. Accordingly, the scope of the invention is intended to be defined only by reference to the appended claims. While variations have been described and shown, it is to be understood that these variations are merely exemplary of the present invention and are by no means meant to be limiting.

7

8

We claim:

**1**. A recessed lighting fixture located in an opening of a surface, the surface having an outer side and an inner side, the recessed lighting fixture comprising:

an LED driver having a power cable;

an LED array disposed underneath the LED driver and connected thereto;

a heat sink having a cylindrical body with a top and an open bottom, the top receiving the LED driver and LED array disposed at the open bottom, wherein a plurality of heat fins extend radially from the heat sink, and wherein a radial flange circumscribes the bottom of the heat sink and defines a flat, first annular surface, wherein the heat sink, fins, and flange include a heat dissipating and conductive material;

at least one magnet disposed on the first annular surface of the flange;

an interchangeable trim ring with an open center, a top and a bottom, the trim ring including a heat dissipating and conductive material and a magnetically attractive material, and further including a flat, second annular surface at the top that abuts the first annular surface of the flange for thermal conduction therebetween, the first and second surfaces joined via at least the magnet; and

wherein the flange of the heat sink and the trim ring are located at the outer side of the surface.

**2**. The recessed lighting fixture of claim **1**, wherein the fixture includes a plurality of magnets recessed into the flange of the heat sink.

**3**. The recessed lighting fixture of claim **1**, wherein heat sink, fins, and flange are formed from an single, integral piece of heat dissipating and conductive material.

**4**. The recessed lighting fixture of claim **3**, wherein the flat, second annular surface of the trim ring toward the open center transitions into a frusto-conical wall.

**5**. The recessed lighting fixture of claim **4**, wherein the frusto-conical wall at the bottom of the trim ring is coated with a light reflective material.

**6**. The recessed lighting fixture of claim **1**, wherein the bottom of the trim ring is at least one of electro-plated, anodized, and painted.

**7**. The recessed lighting fixture of claim **1**, wherein the magnet is selected from the group consisting of a samarium-cobalt magnet, a neodymium magnet, a ceramic/ferrite magnet, or an alnico magnet.

**8**. The recessed lighting fixture of claim **1**, wherein the heat sink includes a material selected from the group consisting of aluminum, steel, cast iron, or ceramic.

**9**. The recessed lighting fixture of claim **1**, wherein the trim ring includes a sloped wall surrounding the open center and the sloped wall includes a light reflective surface.

**10**. A recessed lighting fixture located in an opening of a surface, the surface having an outer side and an inner side, the recessed lighting fixture comprising:

an LED driver having a power cable;

an LED array disposed underneath the LED driver and connected thereto;

a heat sink having a cylindrical body with a top and an open bottom, wherein a plurality of heat fins extend radially from and above the heat sink such that the LED driver rests on top of the heat fins leaving a plurality of open spaces therebetween, and wherein a radial flange circumscribes the bottom of the heat sink and defines a flat, first annular surface;

wherein the heat sink, fins, and flange include a heat dissipating and conductive material;

at least one magnet disposed on the first annular surface of the flange;

an interchangeable trim ring with an open center, a top and a bottom, including a heat dissipating and conductive material and a magnetically attractive material, and further includes a flat, second annular surface at the top that abuts against the first annular surface of the flange for thermal conduction, and attaching thereto via at least the magnet, the trim ring further including a sloped wall surrounding the open center having a light reflective surface; and

wherein the heat sink flange and the trim ring are located at the outer side of the surface.

**11**. The recessed lighting fixture of claim **10**, wherein the interchangeable trim ring at the bottom includes a decorative surface treatment.

**12**. The recessed lighting fixture of claim **10**, wherein the magnet includes a rare earth magnet.

**13**. The recessed lighting fixture of claim **10**, wherein an air tight gasket is disposed on top of the flange of the heat sink.

**14**. The recessed lighting fixture of claim **10**, wherein the power cable includes a detachable Edison screw plug.

**15**. The recessed lighting fixture of claim **14**, wherein the power cable includes a snap lock connector to connect and disconnect the Edison screw plug.

**16**. A recessed lighting fixture located in an opening in a ceiling panel, the lighting fixture comprising:

a cylindrical shaped heat sink having a low aspect ratio such that the height is less than the diameter, the heat sink having a top and a bottom, an open center at the top leading to a cavity facing the bottom, the cavity having a sloped wall, the heat sink having a flange at the bottom extending radially outward and defining a flat surface at the bottom;

heat fins disposed at the top and outer circumference of the heat sink;

an LED driver having an electrical cable, wherein the LED driver is disposed on the heat fins leaving an air gap between the LED driver and the heat fin;

an LED array electrically connected to the LED driver and disposed at the open center;

an interchangeable trim ring having an open center with a sloped wall defining a reflector that is covered in a light reflective material, wherein the reflector overlies the sloped wall of the cavity, the trim ring further including a flat annular surface engaging the flat surface of the heat sink flange for thermal conduction therebetween,

wherein the trim ring at the flat annular surface and the heat sink flange are disposed below the ceiling panel; and

a rare earth magnet attaching the flat annular surface of the trim ring to the flat surface of the heat sink flange.

**17**. The recessed lighting fixture of claim **16**, wherein the electrical cable includes a detachable Edison screw plug.

**18**. The recessed lighting fixture of claim **16**, wherein the open center include a lens enclosing the LED array.

**19**. The recessed lighting fixture of claim **16**, wherein the rare earth magnet includes a neodymium magnet.

**20**. The recessed lighting fixture of claim **16**, wherein the heat sink includes cast aluminum.

\* \* \* \* \*

# EXHIBIT 2



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

34408          7590          03/05/2013

THE ECLIPSE GROUP LLP
6345 Balboa Blvd., Suite 325
Encino, CA 91316

| EXAMINER |
|---|
| WALFORD, NATALIE K |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2879 | |

DATE MAILED: 03/05/2013

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/338,191 | 12/27/2011 | SETH CHANG | JWI11001USU | 5773 |

TITLE OF INVENTION: RECESSED LED LIGHTING FIXTURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $885 | $300 | $0 | $1185 | 06/05/2013 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to: Mail** **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or Fax (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

34408    7590    03/05/2013

THE ECLIPSE GROUP LLP
6345 Balboa Blvd., Suite 325
Encino, CA 91316

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/338,191 | 12/27/2011 | SETH CHANG | JWI11001USU | 5773 |

TITLE OF INVENTION: RECESSED LED LIGHTING FIXTURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $885 | $300 | $0 | $1185 | 06/05/2013 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| WALFORD, NATALIE K | 2879 | 362-294000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/338,191 | 12/27/2011 | SETH CHANG | JWI11001USU | 5773 |

34408        7590        03/05/2013

THE ECLIPSE GROUP LLP
6345 Balboa Blvd., Suite 325
Encino, CA 91316

| EXAMINER |
|---|
| WALFORD, NATALIE K |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2879 | |

DATE MAILED: 03/05/2013

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 6 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 6 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| | Application No. | Applicant(s) | |
|---|---|---|---|
| ***Notice of Allowability*** | 13/338,191 | CHANG ET AL. | |
| | Examiner | Art Unit | |
| | NATALIE WALFORD | 2879 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☐ This communication is responsive to _____ .

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-20*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*  c) ☐ None  of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 12/27/11

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____ .

Application/Control Number: 13/338,191                                    Page 2
Art Unit: 2879

# DETAILED ACTION

### *Allowable Subject Matter*

Claims 1-20 are allowed.

The following is an examiner's statement of reasons for allowance:

Regarding claim 1, the references of the Prior Art of record fails to teach or suggest the combination of the limitations as set forth in claim 1, specifically for the limitation of a heat sink having a cylindrical body with a top and an open bottom, the top receiving the LED driver and LED array disposed at the open bottom, wherein a plurality of heat fins extend radially from the heat sink, and wherein a radial flange circumscribes the bottom of the heat sink and defines a flat, first annular surface, wherein the heat sink, fins, and flange include a heat dissipating and conductive material; at least one magnet disposed on the first annular surface of the flange; an interchangeable trim ring with an open center, a top and a bottom, the trim ring including a heat dissipating and conductive material and a magnetically attractive material, and further including a flat, second annular surface at the top that abuts the first annular surface of the flange for thermal conduction therebetween, the first and second surfaces joined via at least the magnet in combination with other claimed features of the present claimed invention.

Regarding claims 2-9, claims 2-9 are allowable for the reasons given in claim 1 because of their dependency status from claim 1.

Regarding claim 10, the references of the Prior Art of record fails to teach or suggest the combination of the limitations as set forth in claim 10, specifically for the limitation of a heat sink having a cylindrical body with a top and an open bottom, wherein a plurality of heat fins extend radially from and above the heat sink such that the LED driver rests on top of the heat

Application/Control Number: 13/338,191                                        Page 3
Art Unit: 2879

fins leaving a plurality of open spaces therebetween, and wherein a radial flange circumscribes the bottom of the heat sink and defines a flat, first annular surface; wherein the heat sink, fins, and flange include a heat dissipating and conductive material; at least one magnet disposed on the first annular surface of the flange; an interchangeable trim ring with an open center, a top and a bottom, including a heat dissipating and conductive material and a magnetically attractive material, and further includes a flat, second annular surface at the top that abuts against the first annular surface of the flange for thermal conduction, and attaching thereto via at least the magnet, the trim ring further including a sloped wall surrounding the open center having a light reflective surface in combination with other claimed features of the present claimed invention.

Regarding claims 11-15, claims 11-15 are allowable for the reasons given in claim 10 because of their dependency status from claim 10.

Regarding claim 16, the references of the Prior Art of record fails to teach or suggest the combination of the limitations as set forth in claim 16, specifically for the limitation of heat fins disposed at the top and outer circumference of the heat sink; an LED driver having an electrical cable, wherein the LED driver is disposed on the heat fins leaving an air gap between the LED driver and the heat fin; an LED array electrically connected to the LED driver and disposed at the open center; an interchangeable trim ring having an open center with a sloped wall defining a reflector that is covered in a light reflective material, wherein the reflector overlies the sloped wall of the cavity, the trim ring further including a flat annular surface engaging the flat surface of the heat sink flange for thermal conduction therebetween, wherein the trim ring at the flat annular surface and the heat sink flange are disposed below the ceiling panel in combination with other claimed features of the present claimed invention.

Application/Control Number: 13/338,191                                    Page 4
Art Unit: 2879

Regarding claims 17-20, claims 17-20 are allowable for the reasons given in claim 16 because of their dependency status from claim 16.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."


### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

Genenbacher (US 8,128,264) is cited to show a magentic light fixture.

Sevack et al. (US 7,748,869) is cited to show a recessed lighting fixture with projector accessory.

Rappaport (US 7,399,104) is cited to show a universal trim for recessed lighting.

Wein (US PUB 2011/0267827) is cited to show a light consumable housing and changing system.


### *Contact Information*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Natalie K. Walford whose telephone number is (571)-272-6012. The examiner can normally be reached on Monday-Friday, 10 AM - 6:30 PM.

Application/Control Number: 13/338,191                                        Page 5
Art Unit: 2879

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Nimesh Patel can be reached on (571)-272-2457.  The fax phone number for the

organization where this application or proceeding is assigned is (571)-273-8300.

    Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


nkw
/Natalie K. Walford/
Primary Examiner, Art Unit 2879

| *Notice of References Cited* | Application/Control No. 13/338,191 | Applicant(s)/Patent Under Reexamination CHANG ET AL. | |
|---|---|---|---|
| | Examiner NATALIE WALFORD | Art Unit 2879 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-8,128,264 | 03-2012 | Genenbacher, Shawn Michael | 362/398 |
| * | B | US-7,748,869 | 07-2010 | Sevack et al. | 362/277 |
| * | C | US-7,399,104 | 07-2008 | Rappaport, Margaret | 362/365 |
| * | D | US-2011/0267827 | 11-2011 | Wein, Bradley | 362/368 |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

# EXHIBIT 3

MANDOUR & ASSOCIATES, APC
JOSEPH A. MANDOUR, III (SBN 188896)
Email: jmandour@mandourlaw.com
GORDON E. GRAY (SBN 175209)
Email: ggray@mandourlaw.com
BEN T. LILA (SBN 246808)
Email: blila@mandourlaw.com
2030 Main Street, Suite 1300
Irvine, CA 92614
Telephone:  (949) 474-9330
Facsimile: (949) 474-9390
Attorneys for Defendants,
ZHEJIANG YANKON GROUP CO., LTD.
and YANKON INDUSTRIES INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| CORDELIA LIGHTING, INC., a California corporation, | Civil Case No. 14 CV 00881 JGB(SPx) |
| Plaintiff, | **DEFENDANT YANKON INDUSTRIES INC.'S RESPONSE TO PLAINTIFF COREDLIA LIGHTING, INC.'S INTERROGATORIES** |
| v. | |
| ZHEJIANG YANKON GROUP CO., LTD. D/B/A ENERGETIC LIGHTING, a China company, and YANKON INDUSTRIES INC., a California corporation, | **(SET ONE)** |
| Defendants. | |
| ZHEJIANG YANKON GROUP CO., LTD. D/B/A ENERGETIC LIGHTING, a China company, and YANKON INDUSTRIES INC., a California corporation, | |
| Counterclaimants, | |
| v. | |
| CORDELIA LIGHTING, INC., a California corporation, | |
| Counter-defendant. | |

PROPOUNDING PARTY: CORDELIA LIGHTING, INC.

RESPONDING PARTY: YANKON INDUSTRIES, INC

SET NUMBER: One (1)

Pursuant to Fed.R.Civ.P. 26 and 33, defendant Yankon Industries, Inc. ("Responding Party") responds to the interrogatories of Plaintiff Coredlia Lighting, Inc. ("Propounding Party") as follows:

## **PRELIMINARY STATEMENT**

Responding Party has not yet completed is investigation relating to the facts of this action and has not completed discovery in this action.  The responses provided herein are based upon the information presently available to Responding Party.  Responding Party reserves the right to amend or further supplement its responses.  Responding Party reserves the right to object to any interrogatory on any grounds.  Responding Party reserves the right to object to the use of the information provided in the response to any interrogatory.  Responding Party has made a good faith and reasonable efforts to respond to each interrogatory to the extent Responding Party understands the interrogatories.  To the extent any interrogatory requires Responding Party to investigate information required for a response, Responding Party has exercised reasonable diligence to obtain any such information.

Consistent with its obligations pursuant to the Federal Rules of Civil Procedure and in a good faith attempt to respond, Responding Party has contacted those persons and made a duly diligent search of those records most reasonably believed to possess or contain information responsive to any individual interrogatory.  Responding Party's responses are complete to the extent reasonably achievable but Responding Party does not, and could not possibly, represent that these responses reflect or include "all" potentially responsive information located

anywhere accessible to Responding Party.  Rather, the scope of the investigation being conducted to locate responsive information has been limited to making inquiries to those individuals most likely to be knowledgeable about the specific matters at issue, and to reviewing Responding Party's files in which information related to such matters ordinarily would be expected to be found.

By making these responses, Responding Party does not concede that the information sought is relevant.  Responding Party makes these responses without in any way intending to waive or waiving, but on the contrary, intending to preserve and preserving: (a) the right to object on any grounds to the use or introduction into evidence of the information provided in response to the Interrogatories; (b) the right to object to the use of these responses in any subsequent proceeding in, or the trial of, this or any other action on any grounds; (c) the right to object to the  introduction of these responses into evidence; and (d) the right to object on any ground at any time to other interrogatories or other discovery involving the subject matter thereof.

Responding Party has made reasonable efforts to respond to each interrogatory to the extent it has not been objected to, as Responding Party understands and interprets the interrogatory.  To the extent that Propounding Party asserts an interpretation of any interrogatory that is inconsistent with Responding Party's understanding, Responding Party reserves the right to amend or supplement its objection and/or responses.

## **GENERAL OBJECTION**

1.      Responding Party objects to each interrogatory to the extent that it seeks information that constitutes attorney-client privilege, the attorney work product privilege, confidential information, or information protected by a right to privacy.  Nothing contained in these responses is intended, nor shall it in any way

be deemed as, a waiver of any applicable privilege, doctrine, right to privacy, or related right.

2.      Responding Party objects to each interrogatory to the extent that they require Responding Party to undertake any obligations broader than, or inconsistent with the Federal Rules of Civil Procedure.

3.      Responding Party objects to each interrogatory to the extent it is overly broad and unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Responding Party hereby incorporates this General Objection into each of the Reponses set forth below, as if set out in full.

## **RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Explain in detail the relationship between co-Defendants Yankon Industries, Inc. and Zhejiang Yankon Group Co., Ltd., including whether or not the former is a wholly-owned subsidiary of the latter, and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 1:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the interrogatory as vague and ambiguous as to the term "in detail" as the level of "detail" is not specified.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action. Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Yankon Industries, Inc. is a wholly owned subsidiary of Zhejiang Yankon Group Co., Ltd.

**INTERROGATORY NO. 2:**

Explain in detail the circumstances of Yankon's first awareness of the '204 patent-in-suit, including identifying all individuals involved and any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 2:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the interrogatory as vague and ambiguous as to the term "in detail" as the level of "detail" is not specified.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action. Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party became first aware of U.S. Patent No. 8,454,204 on August 22, 2013, when it commissioned a patent search through counsel.  All documents and communications responsive to this interrogatory are attorney-client privileged.

**INTERROGATORY NO. 3:**

Identify all entities or individuals with whom anyone from Yankon has discussed this lawsuit or the '204 patent, including but not limited to discussions with Yankon's customers, potential customers, vendors, partners, affiliates, or co-Defendant Zhejiang Yankon Group Co., Ltd., and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Stewart Walsh, Walsh IP, LLC and Guillermo E. Baeza, Senior Counsel, Lowe's Companies, Inc.

All documents and communications responsive to this interrogatory are attorney-client privileged.

**INTERROGATORY NO. 4:**

Explain in detail Yankon's proposed claim construction concerning the '204 patent, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the interrogatory as vague and ambiguous as to the term "in detail" as the level of "detail" is not specified.  Responding Party objects to the interrogatory as compound.  Responding Party objects to this interrogatory as vague, ambiguous and untimely as plaintiff has failed to specify the claims allegedly infringed.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

The documents relevant to claim construction are the '204 patent and its file history and dictionary definitions for "cylinder" and "annular."

Responding Party reserves the right to supplement this interrogatory as

plaintiff's contentions are specified and in the event extrinsic evidence, if any, is deemed relevant to claim construction for the '204 patent.  Responding Party anticipates that the following claim terms will be at issue:

1.   Heat sink: A metal (cast aluminum, steel or iron alloy) passive heat exchanger conducive to dissipate heat of the light fixture via conduction. *See* '204 patent, Figs. 1-2, ref. #16 and Col. 5, ll. 42-48.

2.   Cylindrical body:  A body shaped like a cylinder, namely a three-dimensional surface or solid object bounded by a curved surface and two parallel circles of equal size at the ends.  *See* '204 patent, Fig. 4, ref. #16.

3.   Annular surface: A surface forming or shaped like a ring.  *See* '204 patent, Fig. 2, ref. #34 and Col. 4, lines 19-24.

4.   Heat dissipating and conductive material: Material that is the most efficient for the thermal conduction of heat from the LED array, namely cast aluminum, steel or iron alloys.  *See* '204 patent, Col. 5, lines 42-48.

5.   Thermal conduction: The transfer of heat in and through a body, namely through the heat sink from the LED array to the fins and flange. *See* '204 patent, Col. 5, lines 42-48.

6.   Radial flange: A flat surface shaped like a ring circumscribing the bottom of the heat sink where the radii of the flange have a common center.  *See* '204 patent, Fig. 2, ref. #34 and Col. 4, lines 19-24.

7.   Light reflective surface: a portion of the trim ring coated with material to reflect light from the LED array.  *See* '204 patent, Fig. 7, ref. #58 and Col. 6, ll. 5-12.

8.   Ceiling panel:  A planar surface that separates the living space of the room below it from the attic or air space above it where electrical cables, insulation, and HVAC ducting are contained.  *See* '204 patent, Fig. 3, ref. #42 and Col. 4, ll. 25-31.

9.   Cylindrical shaped: A body shaped like a cylinder, namely a three-

dimensional surface or solid object bounded by a curved surface and two parallel circles of equal size at the ends.  *See* '204 patent, Fig. 4, ref. #16.

10. Extending radially outward:  Where a surface extends circularly outward from a common center.  *See* '204 patent, Fig. 2, ref. #34 and Col. 4, lines 19-24.

11. Reflector: a portion of the trim ring covered in light reflective material.  *See* '204 patent, Fig. 7, ref. #58 and Col. 6, ll. 5-12.

12. Light reflective material: a portion of the trim ring coated with material to reflect light from the LED array.  *See* '204 patent, Fig. 7, ref. #58 and Col. 6, ll. 5-12.

13. Flat annular surface:  A flat surface forming or shaped like a ring.  *See* '204 patent, Fig. 2, ref. #34 and Col. 4, lines 19-24.

14. Rare earth magnet:  A neodymium or samarium-cobalt magnet.  *See* '204 patent, Col. 6, ll. 22-38.

**INTERROGATORY NO. 5:**

Explain in detail the design and development of the "Utilitec Pro LED Recessed Retrofit Downlight" in 4-inch and 5- or 6-inch housing sizes ("the Accused Products") referred to in Paragraph 8 of the Complaint, including identifying all individuals involved in the design and/or development process, and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the interrogatory as vague and ambiguous as to the term "in detail" as the level of "detail" is not specified.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.

Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party identifies the following documents illustrating the development and design of the "Utilitec Pro LED Recessed Retrofit Downlight". Yankon1 – Yankon10.

**INTERROGATORY NO. 6:**

Identify the name and model number(s) of all Yankon products utilizing a magnetically attractive material in a trim ring for a recessed lighting fixture, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

UTILITECH PRO, 4" and 5" or 6" models.  Yankon6-10.

**INTERROGATORY NO. 7:**

Identify each officer, director, and managing agent—as those terms are used in Fed. R. Civ. P. 30(b)(6)—of Yankon Industries, Inc. and Zhejiang Yankon Group Co., Ltd., including particularly any individuals involved in the design, development, marketing, licensing, or sales of the Accused Products, and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 7:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein. Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action. Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Michael Chen, president of Yankon Industries, Inc.

**INTERROGATORY NO. 8:**

Explain in detail any testing of any heat sink materials, including identifying all individuals involved in such testing, and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 8:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein. Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action. Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party is not aware of any testing of heat sink materials.

**INTERROGATORY NO. 9:**

Explain in detail the factual basis for any contention that U.S. Patent No. 7,722,227 ("the '227 patent") is both material and non-cumulative prior art to the '204 patent, and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

The '227 patent identifies the elements of the claimed invention, particularly the limitations identified in the notice of allowable subject matter, p. 2.   Moreover, the notice of allowable subject matter in the '227 patent file history states that the prior art does not disclose, *inter alia,* a heat sink having a cylindrical body… wherein a radial flange circumscribes the bottom of the heat sink and defines a flat annular surface.  *See* '227, Fig. 2, ref. nos. 52 and 58 and Col. 7, l. 55-Col. 8, l. 15.  The remaining limitations listed in the '204 file history notice of allowable subject matter are also present in the '227 patent.  Accordingly, the reference is material and not cumulative *per se*.

Moreover, when further combined with Chinese Pat No. CN 201448704 (produced herewith), the claims of the '204 patent are invalid as obvious per §103.

**INTERROGATORY NO. 10:**

Explain in detail the factual basis supporting Yankon's allegations of non-infringement, including as stated in its First Affirmative Defense and in Paragraph 14 of the Counterclaim, including that they "have not infringed and do not infringe, contribute to the infringement of, or actively induce others to infringe literally or by the doctrine of equivalents any valid claim contained in the '204 Patent," and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 10:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party also objects to this request as untimely as plaintiff has not identified the claims allegedly infringed and there has not been a claim construction of the claim terms.  Accordingly, Responding Party reserves the right to modify its non-infringement position when the accusation and claim terms are clarified.  Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party does not sell, offer to sell, or import any product covered by any claim of the '204 Patent.  Additionally, the '204 Patent is invalid as anticipated or obvious in view of the prior art.  Several claim elements are clearly missing from the accused models.  For example, the heat sink in both accused models is not cylindrical.  *Compare* with Fig. 4, '204 patent.  Instead, it is clearly conical in shape with sloped sides.  The heat sink also does not comprise a flange as required by each of the independent claims.  Instead, the lower circumference of the heat sink terminates at its fins and does not extend beyond.  In contrast, the specification of the '204 Patent discloses a "radial, annular flange 34 around the circumference at its bottom."  Col. 4, ll. 17-19. The lower circumference of the heat sink in the UTILITECH PRO models attaches, instead, to a non-conductive, white plastic piece that does not dissipate heat.  This plastic does not act as a heat sink and, as shown in the bottom views attached, is not annular.  Moreover, when installed, the heat sink sits above the "surface" or "ceiling panel" and does not extend below said surface or ceiling panel to meet the trim ring as required by the claims and as shown in Figure 4 of the '204 patent.  Instead, the trim ring of

accused device is attached to the plastic piece and not the heat sink.  In contrast, the specification of the '204 patent discloses that "the heat sink 16, fins 50 and flange 34 are all preferably formed from one unitary piece" and identifies cast aluminum, steel and iron alloys as heat dissipating, conductive materials for these elements.  *See* '204 patent, Col. 5, ll. 42-48.   The accused trim ring also does not comprise a light reflective surface as disclosed by the '204 patent.

**INTERROGATORY NO. 11:**

Explain in detail the factual basis supporting Yankon's allegations of invalidity, including as stated in its Second Affirmative Defense and in Paragraph 10 of the Counterclaim, including that "the '204 Patent is invalid for failure to meet one or more of the provisions governing patentability under 35 U.S.C. § 100, et seq., including without limitation being anticipated and or obvious in light of U.S. Patent No. 7,722,227," and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Responding Party also objects to this request as untimely as plaintiff has not identified the claims allegedly infringed and there has not been a claim construction of the claim terms.  Accordingly, Responding Party reserves the right to modify its invalidity position when the accusation and claim terms are clarified. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

The claims of the '204 patent are invalid as anticipated by the '227 patent as

each and every claim element is disclosed by the '227 patent.  Moreover, the claims of the '204 patent are invalid as they are obvious under the '227 patent in view of the Chinese Pat. No. CN 201448704 (produced herewith) as each and every element of the claims is disclosed by the combination of these references.

**INTERROGATORY NO. 12:**

Explain in detail the factual basis supporting Yankon's allegations of inequitable conduct, including as stated in its Fourth Affirmative Defense and in Paragraphs 17-18 of the Counterclaim, including that "at the time of filing the application for [the '204 patent], counterdefendant filed an Information Disclosure Statement (IDS) that failed to disclose the existence of counterdefendant's ['227 patent which] was material to the examination of the application for the '204 patent [and] anticipatory, and at a minimum, renders the claims of the '204 patent obvious and thus invalid," and that "counterdefendant, the named inventors, their attorneys or others involved . . . violated 37 C.F.R. § 1.56 and their duty of candor to the Patent and Trademark Office," and including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Plaintiff was aware of the '227 Patent during prosecution of the '204 Patent.  The '227 Patent was not considered by the Patent Office and was not disclosed by Plaintiff.  As shown above, the '227 Patent is material to the issue of patentability

to the '204 Patent, because it anticipates and/or renders obvious the '204 Patent. Plaintiff willfully withheld its knowledge of the foregoing to obtain issuance of the '204 Patent.  In particular, Paul Feng was attorney of record for both the '227 patent and the '204 patent yet failed to disclose the '227 patent during prosecution of the '204 patent. *See* MPEP §§ 2001.06(b) and 2004.  Moreover, on information and belief, Mr. Feng failed to provide a notation to his files during prosecution of the '204 patent as to why the '227 patent was not being disclosed to the USPTO as required by the MPEP § 2004(18).

**INTERROGATORY NO. 13:**

Explain in detail the factual basis supporting Yankon's Third Affirmative Defense alleging estoppel and laches, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party alleges that plaintiff unreasonably delayed taking action with respect to any patent-in-suit, leading to prejudice against Responding Party.

**INTERROGATORY NO. 14:**

Explain in detail the factual basis supporting Yankon's Fifth Affirmative Defense alleging unclean hands, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Plaintiff's inequitable conduct described above comprises its unclean hands.

**INTERROGATORY NO. 15:**

Explain in detail the factual basis supporting Yankon's Sixth Affirmative Defense alleging waiver and acquiescence, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Responding Party alleges that plaintiff unreasonably delayed taking action with respect to any patent-in-suit, leading to prejudice against Responding Party.

**INTERROGATORY NO. 16:**

Explain in detail any opinion, whether written or oral, provided by or to Yankon regarding infringement, validity, enforceability and/or scope of the '204

patent, including the date of such opinion, the author(s) of such opinion, each
recipient of each such opinion, the materials provided for use in the preparation of
each such opinion, any documents embodying each such opinion, and the
substance of each such opinion, and including identifying any relevant documents
including e-mails.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party incorporates by reference the General Objection and
Preliminary Statement contained herein.  Responding Party objects to the extent
the interrogatory seeks information that constitutes confidential, privileged,
proprietary, or trade secret information and/or invades the privacy of a person not a
party to this action.  Responding Party objects to the interrogatory as compound.

**INTERROGATORY NO. 17:**

Explain in detail the factual basis supporting or contradicting any objective
indicia of obviousness related to the '204 patent under the Graham test, including
any asserted commercial success, long-felt but unresolved need, failure of others,
or copying, including identifying any supporting or contradictory documents
including e-mails.

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party incorporates by reference the General Objection and
Preliminary Statement contained herein.  Responding Party also objects to this
request as untimely as plaintiff has not identified the claims allegedly infringed and
there has not been a claim construction of the claim terms.  Accordingly,
Responding Party reserves the right to modify its invalidity position when the
accusation and claim terms are clarified. Responding Party objects to the extent the
interrogatory seeks information that constitutes confidential, privileged,
proprietary, or trade secret information and/or invades the privacy of a person not a
party to this action.  Responding Party objects to the interrogatory as compound.

Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Defendants are unaware of any *Graham* evidence supporting nonobviousness for the claims of the '204 patent.

**INTERROGATORY NO. 18:**

Describe in detail the level of ordinary skill in the art related to the '204 patent, including identifying any supporting or contradictory documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the interrogatory as vague and ambiguous as to the term "in detail."  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party also objects to this request as untimely as plaintiff has not identified the claims allegedly infringed and there has not been a claim construction of the claim terms.  Thus, Responding Party reserves the right to modify its position after claim construction.  Responding Party objects to the interrogatory as compound.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

An ordinary LED lighting designer for recessed LED lighting fixtures.

**INTERROGATORY NO. 19:**

Identify in detail the monthly sales of the Accused Products since 2008, including the customer for each sale, units sold, gross revenues received, cost of goods sold, and gross profits, and including identifying any relevant documents

including e-mails.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

**CONFIDENTIAL - ATTORNEYS EYES ONLY.**

See Yankon271-280.

**INTERROGATORY NO. 20:**

Identify all entities or individuals with whom anyone from Yankon has discussed any license or potential license to the '204 patent, the '227 patent (referenced herein), or to any technology utilized in the Accused Products, including identifying any relevant documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 20:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

None.

**INTERROGATORY NO. 21:**

Explain in detail the factual basis supporting or contradicting any of the factors under the Panduit test for establishing lost profits related to the '204 patent, including identifying any supporting or contradictory documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 21:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound. Responding Party objects to this request as prematurely seeking expert testimony/opinions.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Plaintiff's alleged claim for damages is a matter of expert analysis and opinion, as set forth in Fed. R. Civ. P. 26, by the deadline specified therein. Accordingly, this Interrogatory is premature.

**INTERROGATORY NO. 22:**

Explain in detail the factual basis supporting or contradicting any of the factors under the Georgia Pacific test for establishing a reasonable royalty related to the '204 patent, including identifying any supporting or contradictory documents including e-mails.

**RESPONSE TO INTERROGATORY NO. 22:**

Responding Party incorporates by reference the General Objection and Preliminary Statement contained herein.  Responding Party objects to the extent the interrogatory seeks information that constitutes confidential, privileged, proprietary, or trade secret information and/or invades the privacy of a person not a party to this action.  Responding Party objects to the interrogatory as compound.

Responding Party objects to this request as prematurely seeking expert testimony/opinions.  Subject to and without waiving these objections and in the interest of compromise, Responding Party responds as follows:

Plaintiff's alleged claim for damages is a matter of expert analysis and opinion, as set forth in Fed. R. Civ. P. 26, by the deadline specified therein. Accordingly, this Interrogatory is premature.


Dated: <u>November 14, 2014</u>          MANDOUR & ASSOCIATES, APC


_____
Ben T. Lila (SBN 246808)
Email: blila@mandourlaw.com
Attorneys for defendant,
YANKON INDUSTRIES, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **<u>VERIFICATION</u>**

I, Michael Chen, am president of Yankon Industries, Inc., a defendant in the above captioned action.  I declare under penalty of perjury under the laws of the United States that the foregoing responses are true and correct.

Dated: <u>October 9, 2014</u>

_____
                                     Michael Chen

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2014, I served the foregoing

DEFENDANT YANKON INDUSTRIES INC.'S RESPONSE TO PLAINTIFF

COREDLIA LIGHTING, INC.'S INTERROGATORIES (SET ONE) via email

pursuant to the agreement to service via U.S. Mail and email on the following:

Paul Y. Feng (SBN 146889)
pfeng@onellp.com
John Lord (SBN 216111)
jlord@onellp.com
ONE LLP
4000 MacArthur Blvd., East Tower, Suite 500
Newport Beach, California 92660
Telephone: (949) 444-5677
Facsimile: (949) 258-5081

By:_____
Ben T. Lila (SBN 246808)

# EXHIBIT 4

| From: | Michael Dellatorre |
|---|---|
| To: | "James Keng" |
| Cc: | "David Liu"; "Jessie King"; "Jim Yang"; "Irene Wang" |
| Subject: | RE: Patent Discussion - Energetic Lighting |
| Date: | Tuesday, September 10, 2013 10:38:17 AM |

James,

I appreciate your comments below and looking forward to hearing from you in the near future.

All the best!

Michael Dellatorre
General Sales Manager
Energetic Lighting
13445 12th Street
Chino, CA. 91710

(W) 866-492-6566 (2010)
(M) 949-235-7092
(F) 909-591-2448

**From:** James Keng [mailto:jkeng@cordelia.com]
**Sent:** Tuesday, September 10, 2013 10:13 AM
**To:** 'Michael Dellatorre'
**Cc:** 'David Liu'; 'Jessie King; Jim Yang; Irene Wang
**Subject:** RE: Patent Discussion - Energetic Lighting

Hi Michael,

We will have internal discussion this week and will contact you early next week.

Thanks,
James

**From:** Michael Dellatorre [mailto:mdellatorre@energeticlighting.com]
**Sent:** Tuesday, September 10, 2013 9:53 AM
**To:** jkeng@cordelia.com
**Cc:** 'David Liu'
**Subject:** RE: Patent Discussion - Energetic Lighting

Hi James,

Hope all is well. Just wanted to write and see if you have any time to talk with me over the next day or two and discuss the below issue. Please let me know a good time and I'll phone you.

Michael Dellatorre
General Sales Manager
Energetic Lighting
13445 12th Street
Chino, CA. 91710

(W) 866-492-6566 (2010)
(M) 949-235-7092
(F) 909-591-2448

**Energetic Lighting is a manufacturer of energy efficient bulbs, lamps and fixtures.**
Since 1975, we have grown to seven factories in three countries.
Our North American headquarters is in Chino, California, 40 miles east of Los Angeles.

We are the original manufacturer of the stylish Energy Star rated LED 7.5 and 12 watt Tulip Bulb.
Proud builder of the popular Big E Bulb Metal Halide Replacement Lamp.

*Making the World Brighter*

www.energeticlighting.com

---

**From:** Michael Dellatorre [mailto:mdellatorre@energeticlighting.com]
**Sent:** Monday, September 02, 2013 1:05 PM
**To:** 'Jkeng@cordelia.com'
**Cc:** 'David Liu'
**Subject:** Patent Discussion - Energetic Lighting

Dear Mr. Keng,

I appreciated the time you spent with me on the phone discussing your current patent #US8,454,204B1.  Energetic Lighting is interested in furthering talks with you to see if we can establish an agreement for the use of certain aspects of this patent.  We are willing to negotiate with you or if you are interested in selling said patent .  You mentioned you are out of town next week; please advise me when we would be able to discuss this matter, at your earliest convenience. Is it possible for us to visit you next week when you are back in town?  Please let us know of your interest.

All the best

Michael Dellatorre
General Sales Manager
Energetic Lighting
13455 12th Street
Chino, CA.  91710
(w) 909-591-2345
(m) 949-235-7092

CL000652

# EXHIBIT 10

Case 5:14-cv-00881-JGB-SP Document 40 Filed 03/30/15 Page 54 of 56 Page ID #:383



CHINA IMPORT AND EXPORT FAIR
Since 1957

展 商 展 品 查 询
Exhibitors & Products

Login    My favorites    中 文 | English

National Pavilion    Please input keyword    🔍

➤ Advanced Search

Home → Results → Company Profile

⭐ Add to My Favorite    企业中文详情页

 **ZHEJIANG YANKON GROUP CO., LTD.**

☁ Frequent Exhibitor

## Company Profile

Booth No.
Company Info
Briefing
Contact

## Products ShowRoom

Lighting Equipment [1]

## Scope of Business

LED Lighting[7]
LED Candle
LED bulb
LED down light
LED panel light
LED spot light
LED spot light
LED spotlight
Energy saving lamp[4]
Lighting accessory[1]

### Booth No.

| Lighting Equipment | Phase 1 | 13.2A09-12, 13.2B13-16 |

Tips: 📍 Map    Add by Scan QR Code

### Company Info

| | |
|---|---|
| Brand: | YANKON |
| Main Products: | energy saving lamps, LED LIGHTS, fixtures |
| Number of Staff: | More than 500 |
| Registered Capital: | 968060000 yuan (RMB) |
| Business Type: | Manufacturer |
| Exhibition Records: ( Last 5 Sessions) | 116,115,114,113,112 |

### Briefing



Zhejiang Yankon Group Co., ltd is one of the largest civil manufacturers and export bases of energy saving lamps, the sole non-governmental public company in China lighting industry, the national high-tech company and the leading brand for China electrical lighting source manufacturing. The company now has over 7000 employees over 850 of which are technical members and owns the national technical center and doctor scientific research working station. Yankon mainly contributes to the production of the energy saving products, which includes integrated electronic energy saving lamps, PL energy saving lamps,T5 large power energy saving fluorescent lamps and the accessories, indoor lamps, outdoor lamps, energy saving tube lamps and all special kinds of lamps. Yankon products have obtained over 50 international standard certificates required in the countries and regions such as USA, South-eastern Asia, Middle East, Hong Kong, Macau, etc. Yankon products have been sold to all over the world and Yankon has established production base in Vietnam and sails company in USA and Brazils. Yankon brand has been cognized China Top Brand by China State Administration for Industry & Commerce in end of 2005. Thus, Yankon group becomes the initial national high-tech enterprise in China lighting industry to have China Top Brand, China Exemption From Inspection, China Famous Product and China Famous Export Brand. Yankon brand has been chosen China Top 500 Most Valuable Brands continuously in three years and has broken through RMB 140 million in brand value and ranks 354. China Brand Institute publicized 145 representing brands in 145 industries of China in end of 2006. Yankon brand was chosen as the representing brand in China lighting industry. By far, Zhejiang Yankon Group Co., Ltd has got the capacity of manufacturing 250 million pieces of energy saving lamps, 10 million T5 fixtures and 6 million special fixtures annually and has become one of the largest manufacturers of integra

## Contacts

| | |
|---|---|
| Company Name: | ZHEJIANG YANKON GROUP CO., LTD. |
| Address: | 485 FENGSHAN RD, SHANGYU, ZHEJIANG, P.R. CHINA |
| Province/City: | ZHEJIANGSHANGYU |
| Post Code: | 312300 |
| Website: | http://www.yankon.com |

Login to browse contacts.

Log in using your account to browse exhibitors' contacts and customize
features as mark your own favorites.

| About Us | Contact Us | Recommend using ie8 browser and a resolution | |
|---|---|---|---|
| Copyright | Canton Fair | above 1440*900 to get the best view results | China Foreign Trade Centre All rights reserved |

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 9301 Wilshire Boulevard, Penthouse Suite, Beverly Hills, California 90210.

On March 30, 2015, I caused **DECLARATION OF STEPHEN M. LOBBIN IN SUPPORT OF CORDELIA'S MOTION FOR PRELIMINARY INJUNCTION** to be served to be served by the method of service described as follows:

JOSEPH A. MANDOUR, III
Email: jmandour@mandourlaw.com
BEN T. LILA
Email: blila@mandourlaw.com
GORDON E. GRAY
Email: ggray@mandourlaw.com
**MANDOUR & ASSOCIATES, APC**
2030 Main Street, Suite 1300
Irvine, CA 92614

*Attorneys for Defendants,*
ZHEJIANG YANKON GROUP CO., LTD.
and YANKON INDUSTRIES INC.

[X]   (BY EMAIL)

[X]   (BY MAIL) I am "readily familiar" with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Beverly Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   (BY OVERNIGHT DELIVERY) I caused said envelope (s) to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee (s).

[X]   (FEDERAL) I declare that I am employed in the office of a member of the bar of their court at whose direction the service was made.

Executed on March 30, 2015 at Beverly Hills, California.


_____
By: Christina I. Rodriguez

**PROOF OF SERVICE**