1  Paul Y. Feng (SBN 146889)
   pfeng@onellp.com
2  Stephen M. Lobbin (SBN 181195)
   slobbin@onellp.com
3  **ONE LLP**
   4000 MacArthur Blvd., East Tower, Suite 500
4  Newport Beach, California 92660
   Tel:   949.444.5677
5  Fax:   949.258.5081

6  John Lord (SBN 216111)
   jlord@onellp.com
7  **ONE LLP**
   9301 Wilshire Boulevard, PH
8  Beverly Hills, California 90210
   Tel:   310.866.5157
9  Fax:   310.943.2085

10  Attorneys for Plaintiff/Counterdefendant
    **Cordelia Lighting, Inc.**

11

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14                        **EASTERN DIVISION**

15

16

17

18

| | |
|---|---|
| **Cordelia Lighting, Inc.,** a California corporation, | Case No. 5:14-CV-00881-JGB-SP |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CORDELIA'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **Zhejiang Yankon Group Co., Ltd. d/b/a Energetic Lighting**, a China company, and **Yankon Industries Inc.**, a California corporation, | **[UNDER SEAL PER L.R. 79-5]** |
| Defendants. | Date:  April 27, 2015 Time:  9:00 a.m. Ctrm:  1 |
| AND RELATED COUNTERCLAIMS | Honorable Jesus G. Bernal |
| | [REDACTED VERSION] |

# TABLE OF CONTENTS

I.      INTRODUCTION AND FACTUAL BACKGROUND ...............................1
     A.      Plaintiff Cordelia And Its Patented Product ..........................1
     B.      The Yankon Defendants' Infringing Product ........................4
     C.      Market Effects Of Yankon's Infringement .........................5

II.     LEGAL STANDARD FOR PRELIMINARY INJUNCTION ....................6

III.    LIKELIHOOD OF SUCCESS ON THE MERITS.......................................9

IV.     IRREPARABLE HARM.................................................................................12

V.      BALANCE OF HARDSHIPS.........................................................................19

VI.     PUBLIC INTEREST ......................................................................................20

VII.    CONCLUSION ...............................................................................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs v. Sandoz, Inc.*
544 F.3d 1341 (Fed. Cir. 2008) ........................................................ 17, 21

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) .................................................................. 7

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*
239 F.3d 1343 (Fed. Cir. 2001) .............................................................. 10

*Arc of Calif. v. Douglas*
757 F.3d 975 (9th Cir. 2014) ................................................................... 19

*Aria Diagnostics, Inc. v. Sequenom*
726 F.3d 1296 (Fed. Cir. 2013) .............................................................. 17

*Atlas Powder Co. v. Ireco Chems.*
773 F.2d 1230 (Fed. Cir. 1985) .............................................................. 13

*Bushnell, Inc. v. The Brunton Co.*
673 F. Supp. 2d 1241 (D. Kan. 2009) ...................................................... 8

*Canon, Inc. v. GCC Int'l Ltd.*
450 F. Supp. 2d 243 (S.D.N.Y. 2006) ..................................................... 18

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*
664 F.3d 922 (Fed. Cir. 2012) .............................................. 8, 16, 18, 20

*Cutting Edge Solutions v. Sustainable Low Maintenance Grass*
2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) ....................................... 19

*Hybritech, Inc. v. Abbott Labs.*
849 F.2d 1446 (Fed. Cir. 1988) ........................................................ 20, 21

*M/A-COM Techs. Solutions Holdings, Inc. v. Laird Techs., Inc.*
2014 WL 2727198 (D. Del. June 13, 2014) ...................................... 10, 14

*Microsoft Corp. v. i4i Ltd. P'ship*
131 S. Ct. 2238 (2011) ........................................................................... 11

*Morris & Assoc., Inc. v. Cooling & Applied Tech., Inc.*
2010 U.S. Dist. LEXIS 111945 (E.D.N.C. July 30, 2010)..........................................8

*New England Braiding Co. v. A.W. Chesterton Co.*
970 F.2d 878 (Fed. Cir. 1992) ...............................................................................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
2007 WL 869576 (E.D. Tex. Mar. 21, 2007) ..........................................................19

*Open Text, S.A. v. Box, Inc.*
36 F. Supp. 3d 885 (N.D. Cal. 2014)......................................................................14

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) .............................................................................10

*Polymer Techs., Inc. v. Bridwell*
103 F.3d 970 (Fed. Cir. 1996) ..........................................................................15, 16

*Power Survey, LLC v. Premier Utility Servs., LLC*
2014 WL 6611518 (D.N.J. Nov. 21, 2014) ......................................................7, 9, 13

*PPG Indus. v. Guardian Indus., Corp.*
75 F.3d 1558 (Fed. Cir. 1996) ...............................................................................21

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*
237 F.3d 1359 (Fed. Cir. 2001) ...............................................................................7

*Reebok Int'l Ltd. v. J. Baker, Inc.*
32 F.3d 1552 (Fed. Cir. 1994) ...............................................................................13

*Robert Bosch, LLC v. Pylon Mfg. Corp*
659 F.3d 1142 (Fed. Cir. 2011) .....................................................................8, 14, 21

*Small v. Avanti Health Sys., LLC*
661 F.3d 1180 (9th Cir. 2011) .................................................................................7

*The Research Found. v. Mylan Pharm., Inc.*
723 F. Supp. 2d 638 (D. Del. 2010) ..................................................................17, 18

-iii-

*Titan Tire Corp. v. Case New Holland, Inc.*
566 F.3d 1372 (Fed. Cir. 2009) ..........................................................................7, 10

*Trebro Mfg., Inc., v. Firefly Equip., LLC*
748 F.3d 1159 (Fed. Cir. 2014) ...........................................................................9, 13

*Tuf-Tite, Inc. v. Federal Package Networks, Inc.*
2014 WL 6613116 (N.D. Ill. Nov. 21, 2014) .................................................9, 10, 20

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......................................................................................................7

Pursuant to Local Rule (C.D. Cal.) 7-5(a), Plaintiff Cordelia Lighting, Inc. ("Cordelia") respectfully submits this Memorandum of Points and Authorities in support of its Motion for Preliminary Injunction.

# I.    INTRODUCTION AND FACTUAL BACKGROUND

## A.    Plaintiff Cordelia And Its Patented Product

As this Court recently (and accurately) summarized this patent infringement action:

> Plaintiff Cordelia . . . holds a United States patent that covers a heat-dissipating LED light fixture.  Cordelia alleges [the Yankon] Defendants directly infringe, or induce others to infringe, its patent by selling similar fixtures in the United States . . . [including] the "Utilitec Pro LED Recessed Retrofit Downlight."  Defendants comprise two entities.  One is a Chinese business organization and the other a California corporation; both allegedly do business as "Energetic Lighting" out of the same Chino, California address.

Doc. No. 36 at 1 (internal citations omitted).

Cordelia is a local company in Rancho Dominguez, founded in 1985.  For many years, Cordelia has been a leader in the residential lighting fixture industry, experiencing steady growth and selling its innovative products including through retailers such as Home Depot.  Its product assortment includes decorative lighting such as flushmount, bath, outdoor and chandelier, and functional products such as recessed, shoplights, and fluorescent fixtures, some available in LED.  *See* accompanying declaration of Jessie King ("King Decl.), ¶ 3.  Cordelia has many dozens of patents worldwide; its patent-in-suit—U.S. Patent No. 8,474,204 ("the '204 patent")—issued June 4, 2013 on an application filed December 27, 2011.

1   *See* Doc. No. 1-1 (Complaint, Ex. A); Lobbin Decl. Ex. 1.[1]  The Patent Office

2   approved the '204 patent without raising any substantive objection.  *See* Lobbin

3   Decl. Ex. 2.

4          Entitled "Recessed LED Lighting Fixture," the '204 patent relates to an

5   innovative lighting fixture—typically for home use and mounted in a ceiling—

6   having a "heat sink" element including a flange and a magnetically-mounted,

7   interchangeable "trim ring" allowing for variable colors and other ornamentation.

8   *See* accompanying declaration of James C. Earthman ("Earthman Decl."), ¶ 3.

9   Cordelia's innovative heat sink structure allows heat to dissipate throughout the

10  entire fixture, and the interchangeability of the magnetic trim ring allows for

11  design flexibility with personal décor preferences.  *See* King Decl. ¶ 5.[2]  The

12  figures shown in the '204 patent give examples of possible embodiments of the

13  invention, and Claim 1 includes the following features, among others: (a) "a heat

14  sink having a cylindrical body," (b) "a radial flange circumscribes the bottom of

15  the heat sink and defines a flat, first annular surface," (c) "the heat sink, fins, and

16  flange include a heat dissipating and conductive material," and (d) "an

17  interchangeable trim ring . . . including a heat dissipating and conductive material

18  and a magnetically attractive material."  *See* Earthman Decl. ¶ 5.

19

20

21

_____

22  [1] Exhibits 1-4 and 10 are attached to the Declaration of Stephen M. Lobbin;
    Exhibits 5-9 are attached to the Declaration of James C. Earthman; and Exhibit 11

23  is attached to the Declaration of Jesse King, and all filed herewith.

24  [2] For example, if a customer paints the ceiling, they may simply remove the trim
    ring before painting, and change the color and/or style of the trim ring to match a

25  new look.  This feature also helps Cordelia's retailers, such as Home Depot, cut
    down on their inventory carrying costs as they only need to carry the retrofit trim

26  and different color trim rings rather than stocking entirely new fixtures with

27  different trims and finishes.  *See* King Decl. ¶ 5.

28

1

2     Cordelia's product is shown below; the left photograph shows the recessed

3   lighting fixture with the LED driver, and the right shows the lighter colored

4   magnetic trim ring and the darker bottom of the light fixture:

5

6

7

8             

9

10

11

12

13

14   *See* King Decl. ¶ 9.

15   ██████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   █████████████████████████████████████████████████

19   █████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ███████████████████████████████████████████████████

22   █████████████████████████████████████████████████

23   ██

24

25   _____

26   [3] Cordelia offers its product line in three sizes (4, 5 and 6-inch), and offers retrofit

27   trims in different finishes.  Through its affiliates, Cordelia also offers its products

28   as the "Lite Choice" brand.  *See id.* ¶ 8.

**B.    The Yankon Defendants' Infringing Product**

Cordelia filed this action as soon as it learned that the Yankon Defendants were entering the U.S market by selling an infringing product to Home Depot's competitor, Lowe's. *See* Doc. No. 1 (Complaint). Historically, Lowe's has been about two years behind Home Depot in introducing premium LED recessed lighting fixtures. *See* King Decl. ¶ 25. Here, Lowe's has used Yankon's infringing product as a shortcut in attempting to catch up with Home Depot and to compete in this premium market. Within just the last several months, however, Yankon's infringing products and Lowe's competition have driven prices down so precipitously that the "premium" market for Cordelia's product may already have been destroyed.

The material fact of Yankon's infringement is indisputable. First, Yankon admits that it knew about the '204 patent before it entered the U.S. market. *See* Lobbin Decl. Ex. 3 at 5 (Yankon's Response to Interrogatory No. 2) (Yankon learned of the patent "on August 22, 2013, when it commissioned a patent search through counsel"). Yankon even approached Cordelia in an attempt to license or purchase the '204 patent (which Cordelia declined), but Yankon proceeded to enter the market with its infringing product anyway. *See* Lobbin Decl. Ex. 4. Second, the asserted claims of the '204 patent use ordinary, straightforward terms and language directed to one of ordinary skill in the art, and the comparison of the

asserted claims to Yankon's accused infringing product (pictured below) is similarly straightforward, proving infringement:

 

*See* Earthman Decl. ¶ 8, Ex. 7.

Concerning validity, Yankon has raised only one asserted anticipatory prior art reference—Cordelia's own U.S. Patent No. 7,722,227 ("the '227 patent"). The '227 patent, however, clearly does not include many key elements of '204 patent claims. *See id.* ¶ 11, Earthman Decl. Exs. 6, 9. Because of the clear case of infringement and validity, Cordelia likely will succeed on the merits of its patent infringement claim against Yankon.

### C.     Market Effects Of Yankon's Infringement

Concerning irreparable harm, hardships, and the public interest, Cordelia presents evidence including detailed, percipient and expert testimony explaining the irreversibly damaging effect Yankon's infringement has had and continues to have on the market for the patented products and related markets, and the competitive landscape generally. *See infra* Part IV (including the King and Hanson Declarations, and exhibits thereto). Specifically, without a preliminary injunction, not only will Cordelia's patent protection be eviscerated, but the

1    premium market Cordelia has established for the patented product and related

2    lighting products also would continue to shrink past the point of no return.

3    **II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

4         In a patent case, as in others, a preliminary injunction is warranted where a

5    movant demonstrates (a) likely success on the merits, (b) likely irreparable harm,

6    (c) equities favoring the movant, and (d) that a preliminary injunction is in the

7    public interest.  *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th

8    Cir. 2011); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

9    (2008).[4]  These factors "may be evaluated on a sliding scale."  *Alliance for the*

10   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Winter*, 555 U.S.

11   at 20.  Under the "sliding scale" approach, "the elements of the preliminary

12   injunction test are balanced, so that a stronger showing of one element may offset

13   a weaker showing of another."  *Alliance for the Wild Rockies*, 632 F.3d at 1131;

14   *see also Small*, 661 F.3d at 1187.

15        Likely success on the merits requires that the patent-in-suit likely is (a)

16   infringed, and (b) valid (notwithstanding any challenge by the accused infringer).

17   *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir.

18   2009).  The irreparable harm, hardship and public interest justifying preliminary

19   injunctive relief appear in many forms, including (a) loss of market share, (b) price

20   erosion, (c) reputational harm, and (d) difficulty in collecting damages from the

21   defendant.  As one court further explained:

22   _____

23   [4] "Federal Circuit law governs the standards for granting an application to

24   preliminarily enjoin alleged patent infringement."  *Power Survey, LLC v. Premier Utility Servs., LLC*, 2014 WL 6611518, at *2 (D.N.J. Nov. 21, 2014) (granting

25   preliminary injunction) (*citing Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446,

26   1451 n.12 (Fed. Cir. 1988)).  Moreover, "[A]ll findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial

27   on the merits."  *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d

28   1359, 1363 (Fed. Cir. 2001).

1    Loss of market share and price erosion may be difficult to quantify

2    and thus constitute irreparable harm.  Further, the right to exclude

3    others from a specific market, no matter how large or small that

4    market, is an essential element of the patent right. . . .  Courts have

5    found that lost good will can indicate irreparable harm.  Strained

6    business relationships with third parties can also support a finding of

7    irreparable harm.  Further, courts have found irreparable harm if

8    infringement indirectly encourages others to infringe the patent. . . .

9    The Court agrees that the prospect of collecting money damages from

10   a foreign defendant with few to no assets in the United States tips in

11   favor of a finding of irreparable harm.

12   *Bushnell, Inc. v. The Brunton Co.*, 673 F. Supp. 2d 1241, 1262-63 (D. Kan. 2009)

13   (internal citations omitted) (granting patentee's motion for preliminary injunction);

14   *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("price

15   erosion, damage to ongoing customer relationships, loss of customer goodwill

16   (e.g., when an effort is later made to restore the original price), and loss of

17   business opportunities" support irreparable harm); *Robert Bosch, LLC v. Pylon*

18   *Mfg. Corp*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (forward-looking damages a

19   meaningless remedy if defendant has no ability to pay); *see also Bushnell* at 1264-

20   65 (balancing hardships by comparing "the irreparable harm that would be

21   sustained by the movant if a preliminary injunction were erroneously denied with

22   the irreparable harm that would be sustained by the non-movant if a preliminary

23   injunction were granted in error"); *Morris & Assoc., Inc. v. Cooling & Applied*

24   *Tech., Inc.*, 2010 WL 3745906, at *29 (E.D.N.C. July 30, 2010) ("[T]he public

25   interest is best served by enforcing patents that are likely valid and infringed.")

26   (*quoting Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir.

27   2006)).

28

Memo. Re Pl.'s Mot. for Prelim. Injunction
Case No. 5:14-cv-00881-JGB-SP

In the recent *Tuf-Tite* case, for example, the court found sufficient evidence of irreparable harm where the movant's declaration supported conclusions of price erosion, loss of market share, lost sales, and loss of goodwill from its customer base. *Tuf-Tite, Inc. v. Federal Package Networks, Inc.*, 2014 WL 6613116, at *8 (N.D. Ill. Nov. 21, 2014) (granting preliminary injunction) ("The Court finds that the evidence Federal Package has put forth in this regard is sufficient to meet its burden as to irreparable harm."); *see also Trebro Mfg., Inc., v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (testimony regarding potential harm to reputation in the marketplace and loss of market share sufficient to establish irreparable harm).  Similarly, in the recent *Power Survey* case, the court found irreparable harm where the patentee was forced to bear competition due to the infringement, resulting in lost market share when the infringer entered the market and provided a lower price.  *See Power Survey*, 2014 WL 6611518 (granting preliminary injunction).  The court noted that "Power Survey has the capacity to handle a far greater share of the market . . . [and] the necessary staff to capture a far greater market share."  *Id.* at *7.  Concerning the market assessment, the court found it "subject to price sensitivity because it is a two-supplier market and there is little incentive for the [customer] not to select the cheaper priced service, even if it may not be as good . . . ."  Also, "Power Survey provide[d] two separate examples of price erosion greater than 50%, which has led to decreased revenue."  *Id.*

As the court in *Power Survey* explained further, "In evaluating the appropriateness of injunctive relief, the Federal Circuit noted that it is appropriate to consider, among other things: (1) the fact that the field of technology covered by the patent is new; (2) the fact that the patentee has a large presence in the field; (3) the patent could help establish a market presence and create business relationships; and (4) in the absence of an injunction, other infringers would be encouraged to

1  join." *Id.* at *8 (*citing Hybritech*, 849 F.2d at 1456).  In determining irreparable

2  harm was demonstrated, the court reasoned:

3      The Court finds that there is evidence that Power Survey suffered,

4      and continues to suffer, ***price erosion and loss of market share***, as a

5      result of Defendants' conduct.  The business of mobile vehicular

6      stray-voltage detection is relatively new and the only providers of

7      service in this field are [the two parties].  Without the likely

8      infringement by Defendants, Plaintiff likely would be able to

9      establish its market presence and create strong and lasting business

10      relationships.  Power Survey's presence in the market is being harmed

11      because Defendants can undercut the market both with a cheaper and

12      inferior product.

13  *Id.* at *8 (emphasis added).

14  **III.   LIKELIHOOD OF SUCCESS ON THE MERITS**

15      Patent infringement is shown "where the allegedly infringing device

16  includes all elements of the claim." *Tuf-Tite*, 2014 WL 6613116, at *7 (granting

17  preliminary injunction) (*citing Trebro*, 748 F.3d at 1166).[5]  Likewise, "A patent

18  claim is invalid as anticipated if a single prior art reference discloses . . . all of the

19  limitations of the patent claim."  *M/A-COM Techs. Solutions Holdings, Inc. v.*

20  *Laird Techs., Inc.*, 2014 WL 2727198, at *3 (D. Del. June 13, 2014) (granting

21

22  _____

23  [5] To be sure, a court's determination of likely success on the merits is "not a legal
24  conclusion as to the ultimate issue of infringement."  *Amazon.com, Inc. v.*
   *Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1355-56 (Fed. Cir. 2001).
25  Additionally, Cordelia contends here that because the asserted claims use terms
26  subject to an "ordinary meaning," no preliminary claim construction should be
   necessary in considering a preliminary injunction.  *See* Earthman Decl. ¶ 6;
27  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("A basic
28  principle of claim construction is that 'the words of a claim are generally given

-9-

preliminary injunction) (*citing Impax Labs., Inc. v. Aventis Pharm., Inc.*, 468 F.3d 1366, 1381 (Fed. Cir. 2006)).  Importantly, on a preliminary injunction the burden of proof on the question of patent invalidity remains with the accused infringer. *See Titan Tire*, 566 F.3d at 1377 ("[T]he evidentiary burdens at the preliminary injunction stage track the burdens at trial . . . ."); *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882-83 (Fed. Cir. 1992) (on invalidity issue, court "must . . . make an assessment of the persuasiveness of the challenger's evidence"); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) (affirming "clear and convincing" burden of proof on patent invalidity).

Concerning Yankon's infringement of the '204 patent, Cordelia's expert Dr. James Earthman of the UCI School of Engineering has confirmed the analysis of infringement, including that Yankon's accused product includes each of the elements of the asserted claims.  *See* Earthman Decl. Exs. 6-7 (claim chart of infringement and validity asserting Claims 1-2, 6, 8-10, 13-18, and 20).  Claim 1, for example, recites the following key elements requiring "heat dissipation" and "thermal conduction," as highlighted below:

> 1.  A recessed lighting fixture located in an opening of a surface, the surface having an outer side and an inner side, the recessed lighting fixture comprising:
>
> an LED driver having a power cable;
>
> an LED array disposed underneath the LED driver and connected thereto;
>
> a heat sink having a cylindrical body with a top and an open bottom, the top receiving the LED driver and LED array disposed at the open bottom,

their ordinary and customary meaning.'") (internal quotation marks and citation omitted).

1        wherein a plurality of heat fins extend radially from the heat

2  sink, and

3        wherein a radial flange circumscribes the bottom of the heat

4  sink and defines a flat, first annular surface,

5        ***wherein the heat sink, fins, and flange include a heat***

6  ***dissipating and conductive material***;

7        at least one magnet disposed on the first annular surface of the

8  flange;

9        an interchangeable trim ring with an open center, a top and a

10  bottom,

11        the trim ring including a heat dissipating and conductive

12  material and a magnetically attractive material, and

13        further including a flat, second annular surface at the top that

14  abuts the first annular surface of the flange ***for thermal conduction***

15  ***therebetween***,

16        the first and second surfaces joined via at least the magnet; and

17        wherein the flange of the heat sink and the trim ring are located

18  at the outer side of the surface.

19  Lobbin Decl. Ex. 1; Earthman Decl. Ex. 6.

20        In addition to confirming that each of the structural elements of the claim is

21  present in Yankon's product, Dr. Earthman also analyzed test data confirming the

22  "heat dissipation" and "thermal conduction" characteristic of the radial flange and

23  trim ring components claimed.  *See* Earthman Decl. ¶ 9, Ex. 8.  Dr. Earthman's

24  declaration, claim chart and accompanying photos and figures provide Cordelia's

25  complete analysis supporting its contention of likely success on the merits of its

26  infringement claims.

27

28

      Memo. Re Pl.'s Mot. for Prelim. Injunction
Case No. 5:14-cv-00881-JGB-SP

Concerning validity, Yankon's only assertion of a clear case of anticipation is based on the '227 patent.  *See* Lobbin Decl. Ex. 3 at 13-14 (Response to Interrogatory No. 11) ("The claims of the '204 patent are invalid as anticipated by the '227 patent as each and every claim element is disclosed by the '227 patent.").[6] The '227 patent, however, is a completely different patent directed to a completely different invention—a "recessed baffle trim unit."  *See* Earthman Decl. Ex. 9.  As confirmed again by Dr. Earthman's analysis, the '227 patent contains no disclosure at all of several elements claimed in the '204 patent-in-suit, including the claimed "interchangeable trim ring" having a sloped wall and that is magnetic, conductive and heat dissipating.  *See* Earthman Decl. ¶ 11.  Lacking any disclosure of these claimed elements, the '227 patent does not present a basis for anticipation or invalidity.

## IV.   IRREPARABLE HARM

"Irreparable harm may include loss of market share, price erosion, and lack of market expansion . . . ."  *Power Survey*, 2014 WL 6611518, at *6 (*citing Purdue Pharma*, 237 F.3d at 1368, and *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012)).  Importantly, "The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money."  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (*citing Hybritech*, 849 F.2d at 1457.  Moreover, "Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole."  *Id.* (*citing Hybritech*, 849 F.2d at 1456-57).

---

[6] Yankon has raised obviousness also, but invalidity via obviousness is inherently a weaker contention than invalidity via anticipation.

1       Further, as the Federal Circuit has noted, "Harm to reputation resulting from

2 confusion between an inferior accused product and a patentee's superior product is

3 a type of harm that is often not fully compensable by money because the damages

4 caused are speculative and difficult to measure." *Id.* at 1558; *see also Trebro*, 748

5 F.3d at 1170 ("likely loss of market share and loss of access to customers . . . are

6 pertinent to the irreparable harm inquiry"); *Atlas Powder Co. v. Ireco Chems.*, 773

7 F.2d 1230, 1233 (Fed. Cir. 1985) ("While monetary relief is often the sole remedy

8 for past infringement, it does not follow that a money award is also the sole

9 remedy against future infringement.  The patent statute further provides injunctive

10 relief to preserve the legal interests of the parties against future infringement

11 which may have market effects never fully compensable in money.").  Finally, as

12 the court recently noted in *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 906

13 (N.D. Cal. 2014):

14       Loss of market share to a competitor or the permanent loss of

15       customers as a result of infringing conduct may support a finding of

16       irreparable harm. . . .  ***Courts are more likely to grant an injunction***

17       ***in two-player markets where the parties are direct competitors***.  *See,*

18       *e.g., Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153

19       (Fed. Cir. 2011).  ***In a market where only two parties are directly***

20       ***competing, the potential harm in allowing the defendant to continue***

21       ***its infringing conduct is probably at its greatest***.

22 *Open Text*, 36 F. Supp. 3d at 906 (emphasis added).

23       The court in the recent *MACOM* case granted a preliminary injunction in a

24 situation very similar to the circumstances here.  *See M/A-COM*, 2014 WL

25 2727198.  In *MACOM*, the defendant entered the market for the plaintiff's

26 patented GPS system and began competing for business in the automotive

27 industry.  In assessing the plaintiff's harm as irreparable, the court reasoned:

28

1    MACOM's relationship with Ford is being damaged in a manner that

2    money damages will not fully remedy, and in an amount not entirely

3    calculable. . . . ***MACOM has proven that it has had to give price***

4    ***concessions to Ford, which were required at least in large part***

5    ***because of the emergence of a competitor*** for technology previously

6    sold only by MACOM.  Ford demanded and achieved these price

7    decreases by leveraging Laird as a second source and, ultimately,

8    awarding some business to Laird.  Laird is also in the process of

9    obtaining, and competing for, additional Ford business that would

10    otherwise have been nearly certain to have gone to MACOM.

11    Evidence has also been presented that denying the preliminary

12    injunction could impair MACOM's ability to pursue research and

13    development and lead to layoffs.

14 *Id.* at *5 (emphasis added).

15    The irreparable harm Cordelia faces is nearly identical to that justifying a

16 preliminary injunction in favor of *MACOM*.  First, Yankon's sales of its

17 competitive, infringing, and lower-priced product through Lowe's has caused and

18 would continue to cause irreversible price erosion, loss of market share, and severe

19 harm to Cordelia's market position and customer goodwill, for which it cannot be

20 adequately compensated by monetary damages.  *See* King Decl. ¶ 26; Hanson

21 Decl. ¶ 9, 15-18. ██████████████████████████████

22 ████████████████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████

26 █████████████████████████████████████

27 █████████████████████████████████

28

The price erosion may already be permanent, and surely would be absent a preliminary injunction. *See* Hanson Decl. ¶¶ 17-22. In this cost-conscious environment, customers would resist any effort to increase prices. *Id.* ¶ 17. Thus, it would be extremely difficult for Cordelia and retailers like Home Depot to raise prices once customers have received lower prices for the same product in the same stores. *Id.* ¶¶ 17,18; *see also Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction . . . . Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."). Thus, the opportunity for Cordelia to price its premium products at a premium level has been seriously undermined by Yankon's infringement and their aggressive pricing strategy. In addition, if Yankon's infringement continues and expands, Cordelia may be forced to reduce prices for customers who have not yet demanded price reductions. *Id.*; *see also Celsis,* 664 F.3d at 930 (price erosion, loss of goodwill, damage to reputation, and loss of business opportunities equals irreparable harm).

Also eroding is Cordelia's good will with customers in the premium product category. Cordelia has new premium products in its pipeline which cannot be sold at the premium price through Home Depot because its customer base expects to

pay low prices on premium products.  *See* King Decl. ¶ 24.  For example, besides the Magnetic Trim Downlight, Cordelia sells other premium LED recessed products to Home Depot, such as a "gimbal-mounted" LED lighting fixture.  *Id.* ¶ 24.  Because of the price erosion on the patented product, Cordelia may not be able to maintain its premium pricing on its other products because the customer base, as well as the end-users, expect to pay lower prices on these other premium products. *Id.*  Thus, Yankon's infringement has a long-term impact not only on the patented product, but also on Cordelia's other premium LED recessed products.  The entire premium line will be hurt irreparably.  *Id.*; *see Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (lost good will may equal irreparable harm).

Any argument that monetary damages would be adequate to compensate for patent infringement misses the mark in the particular circumstances here.  Courts have found irreparable harm resulting from patent infringement in many analogous cases, discussed *supra* as well as follows here.  In *Aria Diagnostics, Inc. v. Sequenom,* 726 F.3d 1296 (Fed. Cir. 2013), for example, the Federal Circuit reversed a district court's denial of a preliminary injunction, confirming that price erosion and loss of market share were irreparable harm.  *Id.* at 1304 ("[T]he facts may show that damages would be reparable, [but] this assumption is not sufficient.").  As an additional admonition, the Federal Circuit cautioned, "Patents would lose their character as an exclusive right as articulated by the Constitution and become at best a judicially imposed and monitored compulsory license."  *Id.*

The same reasoning applies here.  Any assumption that Cordelia could simply receive damages would eviscerate the character of Cordelia's patent as an exclusive right.  This is especially true considering that Cordelia has chosen not to license Yankon or anyone else under the '204 patent.  *See* King Decl. ¶ 7.  By retaining exclusive rights to the '204 patent, Cordelia has ensured that potential copiers of its technology, such as Yankon, are excluded from the market.

1    Another analogous result can be found in *The Research Found. v. Mylan*

2    *Pharm., Inc.*, 723 F. Supp. 2d 638 (D. Del. 2010), where the court granted a

3    preliminary injunction based on plaintiff's declarations from its marketing vice

4    president and a damages expert.  *Id.*  As the court reasoned:

5              [T]here is no doubt that Plaintiffs would lose market share, they

6              would also almost certainly experience lost profits and price erosion.

7              While the Court does not believe that measuring these harms would

8              be impossible, it would be very difficult . . . and the Court is

9              convinced that not all of the harm would be fully compensable by a

10             monetary payment.

11   *Id.* at 660 (concluding that "it is more likely than not that Plaintiffs would suffer

12   some irreparable harm").  Here, the price erosion that has occurred likely would be

13   irreversible, and therefore very difficult (if not impossible) to measure.  *See*

14   Hanson Decl. ¶ 22.

15             The *Celsis* case also is analogous, where the Federal Circuit affirmed the

16   grant of a preliminary injunction.  *Id.*, 664 F.3d 922.  To substantiate its claims,

17   Celsis presented fact and expert testimony as well as specific financial records.  *Id.*

18   at 930.  The court found that the irreparable harm to Celsis would include "price

19   erosion, damage to ongoing customer relationships, loss of customer goodwill

20   (e.g., when an effort is later made to restore the original price), and loss of

21   business opportunities."  *Id.* at 930.  Celsis' expert testified to "irreversible price

22   erosion" and "the difficulty in quantifying the effect on reputation and business"

23   due to the infringing activity.  *Id.*  The court concluded by stating that the "mere

24   possibility of future monetary damages does not defeat a motion for preliminary

25   injunction."  *Id.*  Given the substantiated price erosion, loss of market share, and

26   loss of goodwill as a premium supplier, any monetary remedy would be inadequate

27

28

1  to fully compensate Cordelia for the irreparable market harm being caused by

2  Yankon's patent infringement.  *See* Hanson Decl. ¶¶ 22-23.

3      An additional factor supporting irreparable harm is Yankon's status as a

4  foreign defendant.  Because Yankon is primarily a foreign corporation with few

5  assets in the United States, Cordelia would face significant difficulty in collecting

6  damages from Yankon.  The prospect of having to collect damages from a foreign

7  defendant with few assets in the United States tips in favor of irreparable harm.

8  *See Canon, Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 255-56 (S.D.N.Y. 2006)

9  (locating and attaching assets sufficient to satisfy money judgment exceedingly

10  difficult); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 2007 WL 869576,

11  at *2 (E.D. Tex. Mar. 21, 2007) ("[A]ll three defendants are foreign corporations

12  and that there is little assurance that it could collect monetary damages."); *see also*

13  *Bushnell*, 673 F. Supp. 2d 1241.

14      Finally, any argument of delay should fail.  In *Arc of Calif. v. Douglas*, 757

15  F.3d 975 (9th Cir. 2014), for example, the Ninth Circuit held that the district court

16  abused its discretion in concluding that plaintiff's delay of more than two years

17  weighed against irreparable harm.  *Id.* at 990.  The court reasoned that "the

18  significance of such a prudent delay in determining irreparable harm may become

19  so small as to disappear." *Id.* at 991.  In particular, as here, the actual impact of

20  the harm caused became irreparable only over time.  For example, various cuts in

21  compensation, enacted over a period of time, had a cumulative impact.  *Id.* at 990.

22  The Court noted that the harm related in part to the continued economic viability

23  of service providers in the face of cuts in compensation, thus undermining any

24  inference that the plaintiff was "sleeping on its rights." *Id.*

25      The harm to Cordelia—since filing suit less than a year ago—similarly has

26  become irreparable only over this period of time.  As described above, when

27  Cordelia filed suit in May 2014, much of the price erosion and loss of market share

28

Memo. Re Pl.'s Mot. for Prelim. Injunction
Case No. 5:14-cv-00881-JGB-SP

had not yet occurred.  In just the last few months, however, Home Depot has compelled Cordelia to abandon its premium prices, and the other market harms have steadily worsened to the point of irreparability.  *See Cutting Edge Solutions v. Sustainable Low Maintenance Grass*, 2014 WL 5361548, at *6 (N.D. Cal. Oct. 20, 2014) ("[W]here there is a 'credible explanation' for the inactivity—including allowing time for investigation into a potential infringer's activities and delay for settlement negotiations—court will excuse delays in moving for a preliminary injunction.").

## V.   BALANCE OF HARDSHIPS

Balancing hardships requires the court to "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted."  *Hybritech*, 849 F.2d at 1457.  The court may issue a preliminary injunction where "neither party has a clear advantage."  *Id.* at 1457-58 (hardships factor not a "prerequisite" to preliminary injunction).  One important factor to the equitable balancing is whether the infringer took a calculated risk in selling a product that may infringe a known patent, as Yankon did here.  *See Celsis*, 664 F.3d at 931; *see* Lobbin Decl. Exs. 3-4.

In the *Power Survey* case, for example, the court found the relative size of the parties supported an injunction, reasoning in part: "Granting the injunction would only affect one line of Defendants' businesses [while] Power Survey's major revenue source is the [patented] services, [and] it would face a greater comparative hardship if the injunction were not granted."  *Id.*  In balancing hardships in the *Tuf-Tite* case, the court found important the fact that the movant held a "prominent position" in the market, while the accused infringer had "only recently entered the market."  *Tuf-Tite*, 2014 WL 6613116, at *9.

This reasoning is analogous here.  Yankon is a very large company whose overall business would not be greatly affected by a preliminary injunction, besides the fact that Yankon recently entered the "premium" market in which Cordelia enjoyed a prominent position until the infringement at issue.  *See* Lobbin Decl. Ex. 10 ("By far, Zhejiang Yankon Group Co., Ltd has got the capacity of manufacturing 250 million pieces of energy saving lamps, 10 million T5 fixtures and 6 million special fixtures annually and has become one of the largest manufacturers . . . .").  Further, because Yankon avoided research and development costs by copying Cordelia's product, and only began selling the accused products recently, its investment is limited.  Any hardship to Yankon is of its own making.  *See Robert Bosch*, 659 F.3d at 1156 ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected.")

## VI.   PUBLIC INTEREST

The public interest analysis considers "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458.  In *Power Survey*, for example, the court reasoned in part: "[T]he absence of Premier's lower-priced services will not cause the market for stray voltage detection to shrink [because] Power Survey has the ability to service the entire market, and it will likely resume its efforts to increase the market size if its patent right to exclude infringers is honored in this case." *Id.* at 1450. Similarly, here Cordelia is a prominent, mature company who can supply the entire U.S. market for its patented products.  Moreover, the "strong public policy favoring the enforcement of patent rights" also favors preliminary injunctions, where warranted. *PPG Indus. v. Guardian Indus., Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).

1          Moreover, because Cordelia has demonstrated likely success on its

2   infringement claim, the public interest would be served by prohibiting Yankon

3   from infringing Cordelia's patent.  *See Abbott Labs*, 544 F.3d at 1362 ("To the

4   extent that this Court has found a substantial likelihood that the [patent in suit] is

5   valid and enforceable, there can be no serious argument that public interest is not

6   best served by enforcing it").  Accordingly, this final factor also weighs in favor of

7   granting a preliminary injunction.

8   **VII.   CONCLUSION**

9          For each of the foregoing reasons, Plaintiff Cordelia respectfully requests

10   that this Court issue the requested preliminary injunction to enjoin Defendants

11   from any further infringement of the '204 patent-in-suit, in order to appropriately

12   address and mitigate the irreparable harm being caused by Defendants' actions.[7]

13                                  Respectfully submitted,

14   Dated:  March 30, 2015             **ONE LLP**

15

16                             By:   /s/ Paul Y. Feng

17                               Attorneys for Plaintiff

18                             **Cordelia Lighting, Inc**

19

20

21

22

23

24

25   _____

26   [7] Rule 65(c) requires "security in an amount that the court considers proper to pay
    the costs and damages sustained by any party found to have been wrongfully

27   enjoined or restrained."  Here, Cordelia proposes an appropriate and reasonable

28   bond, as determined by the Court.

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 9301 Wilshire Boulevard, Penthouse Suite, Beverly Hills, California 90210.

     On March 30, 2015, I caused **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CORDELIA'S MOTION FOR PRELIMINARY INJUNCTION** to be served to be served by the method of service described as follows:

JOSEPH A. MANDOUR, III
Email: jmandour@mandourlaw.com
BEN T. LILA
Email: blila@mandourlaw.com
GORDON E. GRAY
Email: ggray@mandourlaw.com
**MANDOUR & ASSOCIATES, APC**
2030 Main Street, Suite 1300
Irvine, CA 92614

*Attorneys for Defendants,*
ZHEJIANG YANKON GROUP CO., LTD.
and YANKON INDUSTRIES INC.

    [X]    (BY EMAIL)

    [X]    (BY MAIL) I am "readily familiar" with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Beverly Hills, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    [ ]    (BY OVERNIGHT DELIVERY) I caused said envelope (s) to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee (s).

    [X]    (FEDERAL) I declare that I am employed in the office of a member of the bar of their court at whose direction the service was made.

    Executed on March 30, 2015 at Beverly Hills, California.


_____
    By: Christina I. Rodriguez

**PROOF OF SERVICE**